STATE OF CONNECTICUT *v.* JEAN JACQUES
(AC 17414)

Landau, Schaller and Daly, Js.

Argued February 23—officially released June 1, 1999

*Avery S. Chapman*, special public defender, for the appellant (defendant).

*Michael L. Regan*, senior assistant state's attorney, with whom, on the brief, was *Kevin T. Kane*, state's attorney, for the appellee (state).

*Opinion*

LANDAU, J. The defendant, Jean Jacques,[1] appeals from the judgment of conviction, rendered after a jury

---

[1] The defendant is also known as Jean-Yves Jean-Jacques.

trial, of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a,[2] and carrying a pistol without a permit in violation of General Statutes § 29-35 (a).[3] On appeal, the defendant claims that the trial court improperly (1) failed to suppress an inculpatory statement that he gave to the police, and (2) failed to grant his motion for acquittal on the basis that there was insufficient evidence to support either conviction. We affirm the judgment of the trial court.

After a hearing on the motion to suppress, the trial court reasonably could have found the following facts. On the evening of February 4, 1996, Nadia Joseph and her boyfriend Fresnel Eugene were at the apartment of Joseph's brother on Franklin Street in Norwich. Also present were the defendant and a number of others, including two young Haitian males who had accompanied the defendant, one of whom was seen carrying what appeared to be a nine millimeter handgun. Sometime later that evening, Roland Conte, a friend of the defendant, approached Eugene and told him that the defendant was going to Eugene and Joseph's apartment to spread voodoo powder. Eugene and Joseph were acquainted with the practices of voodoo, having witnessed those practices in Haiti and Brooklyn, New York. Fearing that the defendant's exercise of voodoo powers would kill them, Joseph and Eugene left the apartment

---

[2] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[3] General Statutes § 29-35 provides in relevant part: "(a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ."

sometime between 8 and 8:30 p.m. Shortly thereafter, the defendant and his two Haitian friends also left the apartment.

Joseph and Eugene went to a store to purchase the ingredients for an antidote to the voodoo powder[4] and proceeded to their apartment located within an apartment complex at 495 Laurel Hill Road, Norwich. Upon arriving at their apartment, Eugene and Joseph observed the defendant and his two friends enter another apartment in the same building. The defendant was wearing jeans and a hat. Joseph and Eugene entered their apartment, prepared the antidote and spread it outside their apartment. Thereafter, Joseph and Eugene left their apartment and proceeded toward their car. At that point, they were confronted by the defendant, and his two friends.

The defendant pulled out a gun and pointed it at Joseph and Eugene. As Eugene walked toward the defendant's two friends, the defendant shot him in the back of his head and he collapsed. Joseph then fought with the defendant who hit her face and chest with his gun. As Joseph fell, she heard one of the defendant's friends shout in Creole, "Shoot the girl so she won't talk." Joseph then felt what she believed was a bullet strike her. The next thing she remembers is hearing sirens and being aware of the presence of the police. En route to a hospital, Joseph regained consciousness but spoke unintelligibly to the police. At the hospital, her treating physician asked her who had shot her and she eventually said "Jean-Yves," the defendant, who was her sister's boyfriend.

On February 5, 1996, shortly after midnight, the Norwich police arrested the defendant and transported him to the police station. After the police advised him of

---

[4] The ingredients for the antidote were vinegar, lemon, water and strawberries.

his *Miranda*[5] rights, the defendant made inculpatory statements to the police. Specifically, the defendant indicated to the police that he was present when the homicide occurred, but was not involved with the commission of the crime.[6] Prior to the commencement of trial, the defendant moved to suppress his statements. The trial court denied the motion, finding that the defendant had not asserted a right to counsel and that the defendant had understood and waived his constitutional privilege against self-incrimination. At the conclusion of the trial, the jury found the defendant guilty on the charges of criminal attempt to commit murder and carrying a pistol without a permit.[7] This appeal followed. Additional facts will be discussed where relevant to the issues in this appeal.

## I

The defendant first claims that the trial court improperly failed to suppress an inculpatory oral statement made by him during a custodial interrogation; that is, his statement was made when he was in police custody and it was in response to questioning that was reasonably likely to elicit an incriminating response. See *Rhode Island* v. *Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). Specifically, the defendant claims that because of a language barrier, he received inadequate constitutional warnings from the police officers, as required by *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). As such, he claims that the state failed to prove by a preponderance of the evidence that he validly waived his right to silence and his right to counsel in violation of the fifth, sixth and

[5] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] The defendant's statements to the police are more fully discussed in part II of this opinion.

[7] The defendant was charged with the murder of Eugene in violation of § 53a-54a, but was acquitted at trial.

fourteenth amendments to the United States constitution and article first, §§ 8 and 9, of the constitution of Connecticut.[8] We are not persuaded.

Our standard of review is well established. "On appeal, in order to determine whether the defendant's constitutional rights have been infringed, we review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling admitting the statements was made." *State* v. *Toste*, 198 Conn. 573, 576, 504 A.2d 1036 (1986).

The following additional facts are necessary for our resolution of this claim. The defendant, who was twenty-three years old at the time of his arrest, was born in Haiti where he graduated from high school. He had been in the United States for six years. For the year preceding his arrest, the defendant owned a clothing store in Norwich and was a salesperson there. His customers were predominately English speaking and his limited fluency in English did not interfere with his work.

On the evening of February 4, 1996, around 10 p.m., the police located the defendant at his apartment within the complex where the shooting had occurred. When the police inquired as to whether the defendant had a gun, the defendant replied in English, "No." The police told the defendant to get dressed and then escorted him from the apartment. Once they were outside, the police handcuffed the defendant, placed him in a police vehicle and transported him to the police station where he was booked. Because the defendant appeared to follow all of the instructions, which the police officers

---

[8] "Because the defendant did not advance a separate state constitutional argument, we will limit our analysis to federal constitutional grounds." *State* v. *Guess*, 39 Conn. App. 224, 231, 665 A.2d 126, cert. denied, 235 Conn. 924, 666 A.2d 1187 (1995).

gave in English, the police did not note any language difficulty at that time.

Shortly after arriving at the station, Detective James Daigle performed gunshot residue tests on the defendant's hands, which took about ten minutes. During this time, Daigle questioned and instructed the defendant in English and the defendant responsed appropriately. There was no communication problem during this conversation.[9] Thereafter, Daigle advised the defendant in English of his *Miranda* rights. The defendant acknowledged the advisement of rights by signing a standard notice of rights form. At this point, the defendant was no longer handcuffed.

Thereafter, the investigator, Joseph Russo, decided it would be prudent to get an interpreter to avoid any language consideration in the future and to ensure that there would be no misunderstanding. Russo requested that state trooper Richard Alexandre act as interpreter.[10] Alexandre, who is of Haitian descent, has spoken Haitian Creole for approximately thirty years.[11] While waiting for Alexandre to arrive, Russo processed the defendant and questioned him about his medical and personal history. Russo asked the questions in English and the defendant responded in English. The defendant did not appear to be confused or uncooperative and denied using alcohol, drugs or tranquilizers. The defendant testified at the suppression hearing that when Russo inquired as to his family history, the conversation did not take long because he "could understand what [Russo was] saying."

[9] Daigle was familiar with the defendant, having conversed in English with him on previous occasions when he conducted drug investigations in the Franklin Street area.

[10] Russo was unable to secure a court appointed interpreter. Furthermore, Russo contacted the United States Immigration and Naturalization Service and was informed that an interpreter would have to be provided from its New York office, which Russo concluded would not be appropriate.

[11] The trial court found Alexandre to be fluent in Haitian Creole.

Prior to Alexandre's arrival, the defendant was not questioned regarding his activities the previous day. Before 4 a.m., Russo questioned the defendant with the assistance of Alexandre. Alexandre reread each *Miranda* right to the defendant in English from a standard notice of rights form and then translated it into Haitian Creole. The defendant signed the form after each advisement and thereafter signed the waiver. During the interview, which lasted until about 11 a.m., the defendant was allowed three breaks. The officers provided the defendant with food and beverage, and allowed the defendant the use of the bathroom. The defendant was alert, promptly answered the questions and did not appear to be under the influence of drugs or alcohol. The defendant neither requested that the questioning cease nor did he request an attorney.

"In order to show that the defendant waived his privilege against self-incrimination, the state must prove by a preponderance of the evidence that he knowingly and intelligently waived his constitutional right to remain silent. . . . The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. . . . [T]he question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. . . . The issue of waiver is factual, but our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered

by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation." (Citations omitted; internal quotation marks omitted.) *State* v. *Toste*, supra, 198 Conn. 579–81.

Reviewing the record in this case in light of those factors, we find that the state has met its burden of showing that the defendant had the capacity to understand the meaning of his constitutional rights. The defendant is an adult who graduated from high school in Haiti and had been in the United States for six years. The defendant testified that he could read some English and that he owned and operated a retail clothing store in Norwich. The defendant had no apparent difficulty communicating with the officers, indicating on multiple occasions that he understood his rights. There was also no evidence that the defendant's emotional state impaired his ability to understand his rights.

The defendant, therefore, was fully aware that he had the right not to answer questions and that, if he chose to answer questions, he had the right to stop answering them at any time and to have an attorney present during the questioning. Testimony as to whether the defendant requested an attorney was conflicting. The defendant's testimony at the hearing that he requested an attorney, although discredited by the trial court, suggests, to some degree, that he was familiar with his rights. See *State* v. *Whitaker*, 215 Conn. 739, 755, 578 A.2d 1031 (1990). Furthermore, there was no evidence that the defendant was intoxicated when he made the incriminating statements; in fact, testimony revealed that he

was alert and did not appear to be under the influence of drugs or alcohol.

The state must also prove by a fair preponderance of the evidence that the defendant's waiver of his rights was voluntary. *State* v. *DaEria,* 51 Conn. App. 149, 169, 721 A.2d 539 (1998). "A statement is voluntary if it is the product of an essentially free and unconstrained choice by its maker . . . [i]f it is, if he has willed to [make a statement], it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his [statement] offends due process." (Citation omitted; internal quotation marks omitted.) *State* v. *Huckaby,* 47 Conn. App. 523, 529, 706 A.2d 16 (1998). Our review of the record in this case reveals no evidence from which the trial court could infer that the police used threats or any other coercive tactic to elicit the waiver of the inculpatory statement. Therefore, we conclude that the defendant's waiver was voluntary. See *State* v. *DaEria,* supra, 169 (police overreaching crucial element in inquiry into constitutional voluntariness).

Although there was substantial evidence before the trial court to support the finding that the defendant understood his *Miranda* rights and that he waived those rights, "[w]aiver is not conclusively established by demonstrating that *Miranda* warnings were given and understood. . . . In the absence of an express waiver, the state bears the heavy burden of demonstrating, as a matter of fact, that waiver can be clearly inferred from the actions and words of the person interrogated." (Citations omitted; internal quotation marks omitted.) *State* v. *Toste,* supra, 198 Conn. 582.

A review of the record in this case reveals that there was substantial evidence that the defendant, "through his actions and words waived his right to remain silent."

Id., 583. The police officers read each right to the defendant from a standard notice of rights form, which the defendant signed, thereby acknowledging that he understood his rights. Having been fully apprised of his rights, the defendant answered questions and made inculpatory statements. His responses were inconsistent but detailed. The lack of hesitancy to speak at that time presents some indicia that the defendant desired to speak and to waive his rights. See id. The evidence established that he was not coerced into responding; the officers made no promises or threats. Testimony revealed that the defendant was not handcuffed at the time of the interview, nor was he under the influence of any drug or emotional strain. "[T]he [*Miranda*] warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an act of free will." (Internal quotation marks omitted.) *Ahmad* v. *Redman*, 782 F.2d 409, 413 (3d Cir.), cert. denied, 479 U.S. 831, 107 S. Ct. 119, 93 L. Ed. 2d 66 (1986). The defendant "never expressed any desire to remain silent or that the officers stop asking him questions." *State* v. *Aversa*, 197 Conn. 685, 696, 501 A.2d 370 (1985). "Under these circumstances, the defendant's expressed willingness to speak constituted an explicit affirmative act evidencing waiver . . . ." (Internal quotation marks omitted.) *State* v. *Toste*, supra, 198 Conn. 583. Accordingly, we conclude that the trial court properly admitted the defendant's inculpatory statements.[12]

## II

The defendant also asserts that the evidence presented at his trial was insufficient to support his conviction of criminal attempt to commit murder in violation

---

[12] Because we conclude that the trial court's finding that the defendant validly waived his *Miranda* rights was not clearly erroneous, we need not separately address the defendant's claim that he was denied his right to counsel.

of §§ 53a-49 (a) (2) and 53a-54a, and carrying a pistol without a permit in violation of § 29-35 (a). We are not persuaded.

The following additional facts are necessary for the resolution of this claim. On the evening of February 4, 1996, various residents of the apartment complex observed what appeared to be a black male wearing a loose fitting hat in the parking lot area striking something with a small object he held. Three or four additional persons were observed in the immediate area. The individuals were arguing and swearing in French. One of these persons was a woman who was observed pushing Joseph to the ground. Shortly after 9 p.m., the residents heard gunshots emanating from the direction of the parking lot. Officer James Veiga responded to the scene at approximately 9:12 p.m. and observed Eugene lying on the ground, his head in a pool of blood, exhibiting no signs of life. Near him was Joseph, who was nonresponsive but breathing. Gunpowder in the area of the injury on the right side of her head indicated that Joseph had been shot.

After the police arrested and booked the defendant, they brought him into an interview room where an investigator noticed a blood-like substance on the defendant's blue jeans. The police seized the jeans as evidence. Thereafter, the defendant executed a written waiver of his *Miranda* rights. The defendant then gave inconsistent responses to questions about his activities on February 4, 1996, and about the blood on his jeans. The defendant first indicated that he had left Joseph's brother's apartment only once, but had not left the Franklin Street area. Later, however, the defendant admitted having been at the apartment complex where the shooting had occurred with three Jamaicans and one Haitian from New York, along with Joseph and Eugene, to consummate a drug transaction. He claimed that a dispute ensued at the victim's apartment and one of the New York drug dealers shot Eugene and another

assaulted Joseph. The defendant indicated that during the attack he remained in the car. Once the attack was over, the defendant claimed that he exited the car and ran over to Joseph. The defendant, after lifting Joseph's head and seeing her eyes roll back, ran away.

When the police questioned the defendant about the blood on his jeans, the defendant again gave inconsistent answers. The defendant first stated that he was unaware of how the blood got there. His second response, however, was that a cut on his right leg or ankle had caused the stain. The defendant's third response was that his girlfriend was menstruating. The defendant's final account was that the blood got on his pants when he lifted Joseph's head.

The police seized a number of evidentiary items at the homicide scene, including a nine millimeter magazine with six live rounds, a gunsight covered with a blood-like substance, a spring-like object and live nine millimeter rounds. All were from an AA Arms Model AP970 automatic pistol which, from all outward appearances, was almost exactly that of a TEC-9. Approximately one month before the shooting, the defendant was seen with a gun that appeared to be a TEC-9.

Deborah Messina, a state criminalist, testified about the blood evidence found on the gunsight and on the defendant's jeans. The blood on the gunsight was human blood consistent with type O, which was Joseph's type. The blood on the defendant's pants was human, but Messina was unable to type it because the amount was too small. The bloodstain pattern was made up of twenty-four high velocity blood spatters on the lower right front of the jeans, consistent with a gunshot. Blood spattering from an entrance wound, also referred to as back spatter, sprays backward toward the weapon and the individual. Blood spatter will travel approximately three to four feet from an entrance wound.

The standards by which we review claims of insufficient evidence are well established. "When reviewing a sufficiency of the evidence claim, our courts apply a two-prong test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"It is within the province of the jury to draw reasonable and logical inferences from the facts proven. . . . The jury may draw reasonable inferences based on other inferences drawn from the evidence presented. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . We note that the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. . . . It has been repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether *it* believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . In doing so, we keep in mind that [w]e have not had the jury's opportunity to observe the conduct,

demeanor, and attitude of the witnesses and to gauge their credibility. . . .

"Moreover, [i]n evaluating evidence that could yield contrary inferences, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [t]his court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"It is also the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses. . . . Thus, the issue of the identification of the defendant as the perpetrator of the crime is peculiarly an issue of fact to be resolved by the jury. . . .

"The test for determining whether the evidence is sufficient to sustain a verdict is thus whether the [trier of fact] could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Sanchez*, 50 Conn. App. 145, 149–51, 718 A.2d 52, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998).

Initially, the defendant claims that there was insufficient evidence to prove him guilty of attempt to commit murder in violation of §§ 53a-49 (a) (2) and 53a-54a. We disagree.

"Under . . . § 53a-49 (a) (2), [a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . . Furthermore, the actor's intent can be inferred from his or her verbal or physical conduct and the surrounding circumstances. . . . [T]he attempt is complete and punishable, when an act is done with intent to commit the crime, which is adapted to the perpetration of it, whether the purpose fails by reason of interruption . . . or for other extrinsic cause." (Citations omitted; internal quotation marks omitted.) *State* v. *Pinnock*, 220 Conn. 765, 774–75, 601 A.2d 521 (1992).

Our review of the evidence reveals that the jury reasonably could have found that the defendant intended to kill Joseph and that his actions constituted a substantial step toward achieving that end. Joseph testified that the defendant beat her on her face and chest with his gun and then shot her in the head. Joseph's head wound contained gunpowder residue that indicated the weapon was discharged from less than three feet. Moreover, Joseph's blood was found on the gunsight and on the defendant's pants. "[O]ne who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill." (Internal quotation marks omitted.) *State* v. *Tomasko*, 238 Conn.

253, 259, 681 A.2d 922 (1996). This is such a case. Moreover, the jury was free to infer an intent to kill from the defendant's failure to assist Joseph after the shooting. See id. Accordingly, we conclude that there was ample evidence in the record whereby the jury reasonably could have found that the defendant intended to kill Joseph.

The defendant next claims that there was insufficient evidence to support his conviction of carrying a pistol without a permit in violation of § 29-35 (a). Again, we disagree.

Although the weapon used by the defendant was never recovered, pieces of a weapon were recovered. The parts recovered were from the gun that appeared to be the same as a gun that the defendant was observed to have had about a month prior to the homicide. Photographs of a similar weapon entered into evidence indicated that the barrel length was less than twelve inches. Moreover, testimony revealed that the state of Connecticut never issued the defendant a pistol permit. We conclude, therefore, that there was ample evidence in the record from which the jury reasonably could have concluded that the defendant violated § 29-35 (a).

Finally, in a brief bereft of facts or legal citations, the defendant appears to argue that because the jury acquitted him on the charge of murder as to Eugene, the jury's verdicts are inconsistent and this court should, therefore, invalidate the jury's guilty verdicts on both counts. The offenses charged contain different elements and, of more importance, involve different victims. A conviction on the charge of attempted murder of Joseph is not inconsistent with an acquittal on the charge of murder of Eugene. See *State* v. *Milner*, 46 Conn. App. 118, 122–23, 699 A.2d 1022 (1997). It is axiomatic that a jury verdict may not be overturned on the ground that a conviction on one count is factually

inconsistent with an acquittal on another count. This principle of judicial review, that "[c]onsistency in the verdict is not necessary," was first ruled on in *Dunn* v. *United States*, 284 U.S. 390, 393, 52 S. Ct. 189, 76 L. Ed. 356 (1932). Our Supreme Court has ruled in accordance with *Dunn*. See, e.g., *State* v. *Martin*, 189 Conn. 1, 6, 454 A.2d 256, cert. denied, 461 U.S. 933, 103 S. Ct. 2098, 77 L. Ed. 2d 306 (1983). Because the offenses contain different elements, in addition to different victims, we conclude that the defendant's claim is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.