[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
This habeas corpus action was brought by the petitioner, Jean Jacques seeking habeas corpus relief based upon a claim of ineffective assistance of counsel.
Jacques was tried by a jury before Parker, J. and found guilty of attempt to commit murder and carrying a pistol without a permit. His total effective sentence is 25 years of incarceration, suspended after 21 years. His conviction was affirmed. State v. Jacques, 53 Conn. App. 507
(1999). He is currently in the custody of the Commissioner of Corrections.
The petitioner's Second Amended Petition, dated July 12, 2000 is in two counts. Jacques claims that his trial counsel, Attorney Bruce Sturman rendered ineffective counsel to the petitioner for:
"a. failing to conduct sufficient investigation into the legal issues in the case.
b. failing to conduct sufficient investigation into the prosecution's proof.
c. failing to conduct sufficient investigation into the defense case.
d. failing to conduct sufficient investigation into the witnesses available to support the defense case, including Miller Bellevue, Roland Conte, Woody Boisette, Jean Beausejour, Mark A. Soderberg, Francine Nawracaj, Donna Tetrault, and Officer Kevin Leach.
e. failing to call witnesses to support the defense case, including Roland Conte, Woody Boisette, Jean Beausejour, Mark A. Soderberg, and Francine Nawracaj.
f. failing to establish what clothing the petitioner was wearing on February 4 and 5, 1996.
g. failing to object to the admission of prejudicial evidence by the prosecutor, such as the Department of Public Safety Forensic Laboratory's photographs of its own weapons.
h. failing to move to strike Nadia Joseph's testimony because of Nadia Joseph's failure to understand the meaning and obligation of an oath.
i. failing to object to the admission of Nadia Joseph's out-of-court CT Page 4442 statements."
Jacques also claims that his counsel, Gail Heller rendered ineffective counsel to the petitioner in the ways alleged above in subparagraphs a through d. There also was a third count, against appellate counsel, which was abandoned at the time of the trial of the matter.
At trial, the petitioner, Attorney Gail Heller, Attorney Bruce Sturman, Arthur Brautigan, an investigator for the public defender's office and Attorney Conrad Seifert testified as witnesses. Attorney Seifert was called as an expert witness on behalf of the petitioner. Numerous exhibits, including the trial transcript were placed in evidence before the habeas court.
 I. Legal Standard
"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth andfourteenth
amendments to the United States constitution and article first, § 8, of the Connecticut constitution." (Citation omitted.) Copas v.Commissioner of Correction, 234 Conn. 139, 153, 662 A.2d 718 (1995).
"In Strickland v. Washington, [466 U.S. 668, 104 S.Ct. 2052,8 L.Ed.2d 674
(1984)], the United States Supreme Court adopted a two-part standard for evaluating claims of ineffective assistance of counsel during criminal proceedings: the defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness . ., and (2) that defense counsel's deficient performance prejudiced the defense. . . . The petitioner in Strickland had argued that the applicable standard for showing prejudice should be that the error impaired the presentation of the defense. The court expressly rejected that standard, concluding that it provided no workable principle. . . . The court also expressly rejected the outcome-determinative standard: that counsel's conduct more likely than not altered the outcome in the case. . . . An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome. . . . Accordingly, relying on the test for materiality of exculpatory information not disclosed to the defense, the court reached a compromise that requires a petitioner to demonstrate that CT Page 4443 there is a reasonable probability that the result of the proceedings would have been different had it not been for counsel's deficient performance. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Citations omitted; internal quotation marks omitted.) Copas v. Commissioner of Correction, supra,234 Conn. 154-55.
"The court imposed this prejudice requirement because [t]he government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence. Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. They cannot be classified according to likelihood of causing prejudice. Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense." (Internal quotation marks omitted.Id., 155.
"With regard to the performance component of this inquiry, the defendant must show that counsel's representation fell below an objective standard of reasonableness. . . . The constitution guarantees only a fair trial and a competent attorney; it does not ensure that every conceivable constitutional claim will be recognized and raised. . . . The defendant is also not guaranteed assistance of an attorney who will make no mistakes. . . . What constitutes effective assistance [of counsel] is not and cannot be fixed with yardstick precision, but varies according to the unique circumstances of each representation." (Citations omitted; internal quotation marks omitted.) Jeffrey v. Commissioner ofCorrection, 36 Conn. App. 216, 219, 650 A.2d 602 (1994).
"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls CT Page 4444 within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) Id, 219-20.
"Even if trial counsel's assistance is shown to be ineffective, the petitioner cannot succeed in his claim unless he proves prejudice. . . . This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable . . . An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have a reasonable doubt respecting guilt." (Citations omitted; internal quotation marks omitted.) Id., 220-21.
"A court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance if it is easier to dispose of the claim on the ground of insufficient prejudice." (Internal quotation marks omitted.) Taft v. Commissioner of Correction,47 Conn. App. 499, 504, 703 A.2d 1184 (1998).
"A habeas court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. . . . [A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." (Internal quotation marks omitted.) Harris v. Commissioner ofCorrection, 40 Conn. App. 250, 257, 671 A.2d 359 (1996). Diggs v.Commissioner of Correction, 46 Conn. Sup. 344-349. (1999) CT Page 4445
 II. Discussion
The bases for the claims of ineffective assistance of counsel as to both Heller and Sturman is that they both performed inadequate investigation, and as to Sturman, that he was ineffective because he failed to establish at trial what clothing the petitioner was wearing the night of the murder and attempted murder, and, that Sturman was ineffective for failing to move to strike the testimony of the victim Nadia Joseph at trial. In order to address these claims, some of the factual circumstances surrounding the criminal acts must be elucidated.
On the evening of February 4, 1996, Fresnel Eugene was murdered and Nadia Joseph, Eugene's girlfriend, was brutally wounded outside of the Laurel Ridge Apartments in Norwich, Connecticut. Both of these victims were well known to the defendant. There are varying accounts from the trial witnesses' testimony and petitioner's at the habeas trial as to the events immediately proceeding the commission of the crimes. What does emerge, definitively is that there were several people at the crime scene. Nadia Joseph, the victim, identified the petitioner as the one who shot and beat her. Bellevue, a witness at trial, testified he had seen the petitioner in possession of a gun at some time before the date of the crime. Other witnesses to the crime identified the assailant as an individual in a that, in dark clothing, in jeans, and in a dark colored T shirt.
When the petitioner was arrested for these crimes he made inculpatory statements which placed him at the scene of the crime. At the trial on the habeas matter, the petitioner testified that while he was in the vicinity of the scene of the crime, he had, during the commission of the crimes, stayed in a motor vehicle. It was his firm position that many of the people who he wanted more investigatory interviews with would have confirmed his position. However, his testimony as to his presence in the car is wholly inconsistent with the blood splatter on his pants, which were jeans. He provided more that one explanation for the blood on his pants; each was inconsistent with each other: none were consistent with the high velocity blood splatter pattern on his jeans. That blood splatter was consistent with a back splatter of blood from a gunshot wound at close range. The victim Joseph had gunshot powder residue on her head which was also consistent with a close range shot, less than three feet. This evidence would not have been controverted by any of the individuals that Jacques sought to have further information from.
 A. Claim of Inadequate Investigation CT Page 4445
Attorney Bruce Sturman is a public defender in the New London Judicial District. He represented the petitioner at the probable cause hearing and from December, 1996 forward through the trial. He took the matter over from Attorney Gail Heller of the public defender's office. He has been an assistant public defender since 1986. She represented the petitioner on the charges of murder, attempted murder and carrying a dangerous weapon through part of the early stages, until she went out on leave from her employment. She met with the petitioner, interviewing him both alone and with Mr. Brautigan. She represented the petitioner from February, 1996 for the arraignment to the end of November, 1996. In New London, the State's Attorney's Office had an open file policy in 1996-97, so during their representation of the petitioner, Heller and Sturman both had access to the State's file. They had access to the police reports and all of the statements of the victim Nadia Joseph. At the direction of Heller, the investigator Brautigan interviewed individuals requested to be interviewed by the petitioner: Roland Conte, Miller Bellevue and Shirleen Joseph. Brautigan interviewed both Bellevue and Eli Joseph, Nadia Jospeh's brother, at Corrigan
Correctional Facility. He was there each morning and found it an expedient way to see people `familiar with the system' as they came into it, particularly when they were difficult to locate outside. Eli Joseph had nothing favorable to say for the petitioner. Bellevue did not want to speak with Brautigan or get involved in the matter. Brautigan met Roland Conte at Corrigan as well and had nothing positive to offer for the petitioner. Brautigan spoke with him a second time and Conte told him that the criminal matters were all involved with voodoo. Brautigan met with Shirleen Joseph two or three times. She was the petitioner's girlfriend and he thought she would be helpful to his cause. Brautigan was told by her that she never loved the petitioner, she felt guilty cheating on her New York boyfriend with Jacques and that it was a relationship of convenience. When Brautigan asked her about the two men from New York, she could describe their activities in visiting with Jacques but not their names or how to reach them. As to the names Jean Beausejour and Woody Boisette, Heller and Sturman never heard of them as references to be interviewed from the petitioner. Brautigan met with the petitioner himself at least 10 times. Jacques gave him a list of people to talk to, as he did; the petitioner never mentioned Woody Boisette or Jean Beausejoir to Brautigan. Jacques gave Brautigan the names of Jean Remy Touissant and Cadieux Joseph as the two individuals from New York who were with him on the day of the crime. Jacques gave Brautigan a telephone number for them which was no good when he tried it. Jacques was no more CT Page 4446 help to Brautigan in finding these two people. Heller informed the petitioner that they could not reach these two individuals from New York; he had no other ways to reach them.
Ultimately, the petitioner's own expert, Conrad Seifert, had no opinion as to the sufficiency of Heller's representation of the petitioner. She did not participate in the proceedings except as mentioned herein. Sturman conducted both the probable cause hearing and the trial. The petitioner has failed to establish any prejudice to him as a result of the nature and extent of the investigation conducted by Heller in the pretrial proceedings she was involved in.
Sturman read the statement of Donna Tetrault and the police report regarding her statements. He did not have her interviewed because he already had access to her statements. At the commencement of voire dire for the criminal trial, the state's witness list had the name of Donna Tetrault on it. Sturman assumed pursuant to her statements that she would place Jacques at the crime scene. He had already admitted in his own statement to being there. However, in any case, at trial, Sturman cross examined her on her initial identification and change of it to undermine her credibility. Her testimony was in any case not pivotal because Jacques had put himself at the scene. Therefore, the defense theory pursued by Sturman was to put the gun in someone else's hand, or at least, not in Jacques' hand. As the respondent points out in his trial brief, this strategy was in part successful for the petitioner was acquitted of the most serious charge of murder.
The petitioner's expert, Attorney Conrad Seifert focused on the failure of Sturman to interview Donna Tetrault as the only part of the claim of failure to investigate that had any merit in the habeas petition. As to any other potential witness the petitioner claimed that his counsel did not adequately investigate, Seifert acknowledged that he could not say that it would have made a difference to the outcome of the case.
Donna Tetrault initially gave no statement to the police at the time of the crime. A few days later, she gave different statements to the police. She stated that she saw a group of people at the crime scene and that one was wearing a T-shirt, which was unusual because of the cold temperature outside, and, that the petitioner was wearing a down-type coat. (A different witness had identified the individual who committed the crime as someone wearing a puffy coat.) However, Seifert acknowledged that to give her an opportunity later to re-identify the petitioner might have caused more harm than to help. Seifert acknowledged that Tetrault was a reluctant witness at trial and that he had know way of knowing CT Page 4447 whether an interview of her by the defense prior to trial would have helped. Ultimately, Seifert opined that it was a trial tactical decision regarding this issue and there was no way to know whether the outcome might have been different. At best, the defense may have been better prepared; at worst, Tetrault might have become a more willing, less reluctant witness for the state.
Seifert felt that Sturman should have interviewed Bemier and Hudgins as well. He felt that Sturman might then have been more able to deal with the identification problems regarding petitioner. However, the record regardless, was sufficient to support identification of Jacques when he himself placed himself at the crime scene and was wearing pants at his arrest that demonstrated his presence at the immediate crime scene at the time the crime occurred. No other evidence was presented in this hearing from which the court could conclude that any pre-trial interviews with these two would have produced a different result or any inconsistencies to overcome the other trial evidence sufficient to convict Jacques of the weapons and attempted murder charge.
 B. Testimony of Nadia Joseph
Nadia Joseph had made several different statements, which were inconsistent. In her February 5, 1996 statement, she had stated that her sister was present at the crime, that Jacques had two friends present there and that the dark skinned one had a hand gun and that her sister Shirleen instructed Jacques to shoot Nadia and her boyfriend Eugene Fresnel. Two days later in a statement she said both of Jacques' friends had guns out and that Shirleen told Jacques, after he shot Fresnel, to shoot Nadia so that she would not talk. Two days after that Nadia made a statement in which she said she had not seen her sister on the night at the scene of the crime. Her testimony at the probable cause hearing did not place the sister at the scene of the crime. The focal point of Sturman's crossexamination of Nadia Joseph's testimony at trial was the inconsistencies of her statements regarding the crime. At the end of the state's case, Sturman made a motion for acquittal referencing the problem with Ms. Joseph's testimony and that it must fail because she did not observe or honor an oath. This was not successful.
After listening to her testimony and observing the inconsistent statements of Ms. Joseph, the trial judge (Parker, J.) asked her if she understood what a statement under oath was, to which she replied no. Seifert, petitioner's expert, opined, and petitioner argues here, that the petitioner's trial counsel failed to make the most of this CT Page 4448 opportunity. Seifert opined and petitioner urges that Sturman should have made a motion to strike Nadia Joseph's trial testimony. Seifert testified that he believed that such a motion to strike would have been unsuccessful, whoever, the petitioner would have been "psychologically served" by said motion being made in front of the jury: it would have underlined the point and made an exclamation point of it in front of the jury. Further, he opined that while such a motion would most likely have been unsuccessful, it would have created what he perceived to be an appealable issue.
 C. Petitioner's Clothing
Petitioner argues that his trial counsel was ineffective in failing to establish what clothing he was wearing on the night of the crime. Petitioner urges that Sturman should have established that Jacques was wearing his brown leather jacket and a pair of boots on that night, not a puffy jacket. The boots and jacket would have been helpful, perhaps in regard to some parts of the petitioner's wardrobe but would not have solved one of the ultimate problems he faced in this matter. When petitioner was arrested he was wearing pants that had blood all over them that was consistent with high velocity blood splatter which resulted from being very close to a gunshot wound as it was incurred. Therefore, whatever benefit would have been gained from placing the other clothing on the petitioner, would not have been sufficient to overcome the ultimately inculpating evidence of the trousers that the petitioner was wearing.
 III. Conclusion
The petitioner's habeas action must fail for none of the claims made, either individually, or together have been proven would result in the likelihood of a different outcome. The evidence does not establish that the tactical decisions made along the way by Sturman as to who to interview and how to deal with the Nadia Joseph inconsistencies would have produced a different result. Petitioner's own expert acknowledges a motion to strike Nadia Joseph's testimony would have most likely been unsuccessful. This court will not engage in what conjectural impact the motion would have had psychologically to the jury. Indeed, most certainly if something were to have been stated in front of the jury that it should not have heard, it should have received a proper curative instruction from the trial judge. Certainly habeas petitions will not be determined based upon a petitioner's hope that an idea is psychologically planted in juror's mind to produce a different verdict. Indeed, petitioner's standard of proof is substantially higher than that. The petitioner has CT Page 4449 failed to establish that the representation of the petitioner by his trial counsel, Heller and Sturman fell below an objective standard of reasonableness. Further petitioner has failed to prove that either counsel's representation fell below an objective standard of reasonableness or that defense counsel's performance prejudiced the defense.
The habeas petition is dismissed.
The Court
Munro, J.