JEAN-YVES JEAN-JACQUES *v.* COMMISSIONER OF CORRECTION
(AC 21882)

Mihalakos, Dranginis and Hennessy, Js.

Submitted on briefs September 25—officially released November 26, 2002

*William A. Snider* filed a brief for the appellant (petitioner).

*Kevin T. Kane*, state's attorney, and *Michael L. Regan*, supervisory assistant state's attorney, filed a brief for the appellee (respondent).

*Opinion*

HENNESSY, J. The petitioner, Jean-Yves Jean-Jacques, appeals from the judgment of the habeas court dismissing his second amended petition for a writ of habeas corpus in which he claimed that he had been denied the effective assistance of counsel. On appeal, the petitioner claims that the court improperly concluded that the representation by the petitioner's former attorneys did not fall below an objective standard of reasonableness because they[1] (1) did not file a motion to strike the testimony of a key witness when she stated

---

[1] Two attorneys represented the petitioner during the time period this appeal concerns. Gail Heller represented the petitioner from his arraignment until approximately December, 1996. Bruce A. Sturman became the petitioner's attorney of record at that time and represented the petitioner during his trial, which began March 17, 1997. The petitioner's claim of ineffective investigation is against both attorneys.

that she did not understand the meaning of the word "oath," (2) failed to conduct a proper investigation and (3) did not establish what clothing the petitioner was wearing during the evening of the crimes at issue. We affirm the judgment of the habeas court.

This court stated that the jury reasonably could have found the following facts, as recited in the petitioner's direct appeal from his conviction in *State* v. *Jacques*, 53 Conn. App. 507, 733 A.2d 242 (1999). "On the evening of February 4, 1996, Nadia Joseph and her boyfriend Fresnel Eugene were at the apartment of Joseph's brother on Franklin Street in Norwich. Also present were the [petitioner] and a number of others, including two young Haitian males who had accompanied the [petitioner], one of whom was seen carrying what appeared to be a nine millimeter handgun. Sometime later that evening, Roland Conte, a friend of the [petitioner], approached Eugene and told him that the [petitioner] was going to Eugene and Joseph's apartment to spread voodoo powder. Eugene and Joseph were acquainted with the practices of voodoo, having witnessed those practices in Haiti and Brooklyn, New York. Fearing that the defendant's exercise of voodoo powers would kill them, Joseph and Eugene left the apartment sometime between 8 and 8:30 p.m. Shortly thereafter, the [petitioner] and his two Haitian friends also left the apartment.

"Joseph and Eugene went to a store to purchase the ingredients for an antidote to the voodoo powder and proceeded to their apartment located within an apartment complex at 495 Laurel Hill Road, Norwich. Upon arriving at their apartment, Eugene and Joseph observed the [petitioner] and his two friends enter another apartment in the same building. The [petitioner] was wearing jeans and a hat. Joseph and Eugene entered their apartment, prepared the antidote and spread it outside their apartment. Thereafter, Joseph

and Eugene left their apartment and proceeded toward their car. At that point, they were confronted by the [petitioner], and his two friends.

"The [petitioner] pulled out a gun and pointed it at Joseph and Eugene. As Eugene walked toward the [petitioner's] two friends, the [petitioner] shot him in the back of his head and he collapsed. Joseph then fought with the [petitioner] who hit her face and chest with his gun. As Joseph fell, she heard one of the [petitioner's] friends shout in Creole, 'Shoot the girl so she won't talk.' Joseph then felt what she believed was a bullet strike her. The next thing she remembers is hearing sirens and being aware of the presence of the police. En route to a hospital, Joseph regained consciousness but spoke unintelligibly to the police. At the hospital, her treating physician asked her who had shot her and she eventually said 'Jean-Yves,' the [petitioner], who was her sister's boyfriend.

"On February 5, 1996, shortly after midnight, the Norwich police arrested the [petitioner] and transported him to the police station. After the police advised him of his *Miranda*[2] rights, the [petitioner] made inculpatory statements to the police. Specifically, the [petitioner] indicated to the police that he was present when the homicide occurred, but was not involved with the commission of the crime. . . . At the conclusion of the trial, the jury found the [petitioner] guilty on the charges of criminal attempt to commit murder and carrying a pistol without a permit." Id., 509–11. Additional facts will be set forth as necessary.

The standard of review for a challenge to a court's dismissal of a petition for a writ of habeas corpus based on alleged ineffective assistance of counsel is well established. "The habeas court is afforded broad discre-

---

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

tion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . . In *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court adopted a two part analysis for claims of ineffective assistance of counsel. Under *Strickland*, the petitioner must show that: (1) defense counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for defense counsel's deficient representation, the result of the proceeding would have been different." (Citations omitted.) *Duperry* v. *Solnit*, 261 Conn. 309, 335, 803 A.2d 287 (2002).

The petitioner first claims that his counsel's performance fell below the standard of reasonableness when he failed to make a motion to strike the testimony of a key witness after she testified at trial that she did not understand the meaning of the word "oath." We do not agree with the petitioner.

Joseph gave several inconsistent statements during the course of the criminal investigation, the probable cause hearing and the trial concerning the number of individuals who had a gun on the night she was shot and whether her sister was present during the shooting.[3] After listening to Joseph's testimony during trial, the court asked her, "Do you know what a statement under oath is?" Joseph responded, "No." The court then asked if either counsel had anything to say in view of her response, and neither party objected. At the conclusion of the state's case-in-chief, the petitioner's counsel made a motion for a judgment of acquittal. The basis

---

[3] Joseph's testimony that the petitioner fired the shots that wounded her and killed Eugene remained consistent in all of her statements to authorities.

of the motion was that the state's case relied on the testimony of Joseph and her acknowledgment that she did not understand the meaning of an "oath." The court denied the motion.[4]

At the habeas trial, the petitioner's trial counsel, Bruce A. Sturman, testified that he thought it was "best to make a legal argument at the appropriate time that her testimony should be stricken, which I did on the motion for acquittal, but it was also my experience that the chances of getting the trial judge to exclude her testimony were slim and none . . . . And I thought I could make more hay out of it arguing to the jury that her testimony, when you factor in saying her sister was there, this guy had a gun, this guy didn't, you know, her statements were all over the lot. Coupled with the fact that she didn't know what an oath meant, that was where I could make some impact. So, I waited and I used that bit of evidence in final argument."

At the habeas trial, the petitioner's expert witness, Conrad Seifert, testified that Sturman should have made a motion to strike the testimony of Joseph. Seifert testified that making the motion in front of the jury would have "reinforced" her lack of understanding of an oath. Seifert also testified that making the motion at that time would have preserved the issue for direct appeal, but he added that the petitioner's appeal did claim that the motion for a judgment of acquittal was denied improperly. On cross-examination, Seifert testified that it was likely that the motion to strike Joseph's testimony would have been unsuccessful.

The habeas court concluded that the petition must fail because none of the claims, even if proven, would result in the likelihood of a different outcome, and the

---

[4] The petitioner appealed to this court, challenging, inter alia, the denial of the motion for a judgment of acquittal. This court affirmed the judgment of the trial court in *State* v. *Jacques*, supra, 53 Conn. App. 507.

"petitioner's own expert acknowledges a motion to strike Nadia Joseph's testimony would have most likely been unsuccessful. This court will not engage in what conjectural impact the motion would have had psychologically to the jury. . . . Certainly, habeas petitions will not be determined based upon a petitioner's hope that an idea is psychologically planted in juror's minds to produce a different verdict."

We agree that the petitioner has failed to demonstrate that the outcome of the trial would have been different if a motion to strike had been filed and further note that Joseph's lack of understanding of the meaning of an oath was, in fact, presented to the jury. The motion to strike would have been cumulative in terms of presentation to the jury. "Even if a petitioner shows that counsel's performance was deficient, the second prong, or prejudice prong, requires that the petitioner show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Therefore, [a] habeas court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if the claim may be disposed of on the ground of an insufficient showing of prejudice." (Internal quotation marks omitted.) *Doehrer* v. *Commissioner of Correction,* 68 Conn. App. 774, 778–79, 795 A.2d 548, cert. denied, 260 Conn. 924, 797 A.2d 520 (2002).

The petitioner also claims that his defense counsel were ineffective because they failed to conduct an adequate investigation. Specifically, the petitioner argues that his counsel never canvassed the crime scene, never contacted people living in the apartment complex where the shooting took place and did not use sufficient effort to locate the petitioner's two Haitian friends who witnessed the shooting.

Sturman testified that he relied on the report filed by the Norwich police department and that he had full

access to the state's file. The investigator working with Sturman, Arthur Brautigan, did, in fact, interview several witnesses after the petitioner supplied names. Those witnesses either refused to discuss the shooting or provided information that was of little use to the petitioner. Brautigan testified that he also attempted to locate the two Haitian witnesses in the New York City area after the petitioner supplied a telephone number. That effort proved unsuccessful, and the petitioner did not provide any further assistance to either of his attorneys or to the investigator to locate the two witnesses who were present on the evening in question.

The petitioner further claims that he provided his attorneys with the name of the man who allegedly shot the victims. Both defense counsel and Brautigan deny that the petitioner provided that name. Sturman testified that the first time that he remembers hearing the name of the alleged perpetrator was when he received a copy of a letter written by the petitioner to the trial judge one year after the trial. Sturman also testified that he never canvassed the apartment complex where the shooting took place because he believed that there was enough information from the police reports and the state's file. He believed that he could not develop more information from a continued investigation. Sturman also testified that it was his strategy not to have those witnesses know in advance the line of questions his cross-examination would pursue. He did not believe that those witnesses would have been able to exonerate his client and, therefore, he did not interview them further.

"Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation and without adequate explanation, failed to call the witness at trial. The reasonableness of an investigation must be

evaluated not through hindsight but from the perspective of the attorney when he was conducting it." (Internal quotation marks omitted.) *Tatum* v. *Commissioner of Correction*, 66 Conn. App. 61, 66, 783 A.2d 1151, cert. denied, 258 Conn. 937, 785 A.2d 232 (2001); see also *Nieves* v. *Commissioner of Correction*, 51 Conn. App. 615, 624, 724 A.2d 508, cert. denied, 248 Conn. 905, 731 A.2d 309 (1999). "The burden to demonstrate what benefit additional investigation would have revealed is on the petitioner." *Holley* v. *Commissioner of Correction*, 62 Conn. App. 170, 175, 774 A.2d 148 (2001). The petitioner has not met that burden, nor has he shown that a witness existed who was accessible to his attorneys who would have assisted in his defense at trial.

The petitioner's final claim is that his counsel failed to properly investigate the clothing the petitioner was wearing on the night of the shooting and failed to adequately present the discrepancies of the witnesses' descriptions of his clothing to the jury. Evidence was presented at the habeas trial that approximately three hours before the crime, a taxicab driver had given the petitioner a ride to the police station on a matter unrelated to this case. The driver testified that the petitioner was wearing a dark leather jacket and dark pants. When the petitioner was arrested, he was wearing a brown leather jacket. Some witnesses claimed that the perpetrator was wearing a baggy or puffy jacket.

Some of the witnesses also testified that one of the perpetrators was wearing a floppy hat or a winter hat. The petitioner claims never to have worn a hat. The habeas court noted that those inconsistencies may have been helpful to the petitioner's defense, but "would not have solved one of the ultimate problems he faced in this matter. When the petitioner was arrested, he was wearing pants that had blood all over them that was consistent with high velocity blood splatter, which resulted from being very close to a gunshot wound as

it was incurred. Therefore, whatever benefit would have been gained from placing the other clothing on the petitioner would not have been sufficient to overcome the ultimately inculpating evidence of the trousers that the petitioner was wearing."

In addition, Sturman testified that the petitioner was arrested six hours after the shooting occurred and emphasized that the pants were the crucial piece of clothing. The petitioner also placed himself at the scene of the crime in the statement he gave to the police, which was admitted at trial. The habeas court concluded that the "petitioner has failed to prove that either counsel's representation fell below an objective standard of reasonableness or that defense counsel's performance prejudiced the defense." After a thorough review of the record, we agree with the habeas court that the petitioner was not deprived of his right to effective assistance of counsel.

The judgment is affirmed.

In this opinion the other judges concurred.