LENNARD TOCCALINE *v.* COMMISSIONER OF
CORRECTION
(AC 23544)

Bishop, West and DiPentima, Js.

Argued October 17, 2003—officially released January 6, 2004

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *Christopher Morano*, chief state's attorney, and *Jo Anne Sulik*, assistant state's attorney, for the appellant (respondent).

*Conrad Ost Seifert*, special public defender, for the appellee (petitioner).

### Opinion

BISHOP, J. The respondent commissioner of correction appeals from the judgment of the habeas court

granting the amended petition for a writ of habeas corpus filed by the petitioner, Lennard Toccaline. The habeas court based its decision on the petitioner's claims of ineffective assistance of trial and appellate counsel. The respondent claims that the court (1) misapplied the standard for determining whether trial counsel rendered effective legal assistance, (2) improperly considered claims not raised in the petition and (3) incorrectly determined that the petitioner had established ineffective assistance of appellate counsel. We reverse the judgment of the habeas court.

In the underlying criminal matter, the petitioner was charged in a two part information. In the first part, he was charged with one count of sexual assault in the first degree, two counts of sexual assault in the fourth degree and three counts of risk of injury to a child. In the second part, he was charged with being a persistent dangerous felony offender. After a trial by jury, he was found guilty of one count each of sexual assault in the first degree and sexual assault in the fourth degree, and three counts of risk of injury to a child. Following a court trial, the petitioner was found guilty on the second part of the information.[1] He later was sentenced to forty years incarceration, execution suspended after twenty-five years, and ten years probation. In the petitioner's direct appeal to the Supreme Court, the judgment was affirmed. *State* v. *Toccaline*, 258 Conn. 542, 783 A.2d 450 (2001).

In its opinion, the Supreme Court set forth the factual background as follows: "On the basis of the evidence presented, the jury reasonably could have found the following facts. The victim, MC,[2] was born on May 7,

---

[1] In part II of the information, the state charged that in 1982, the petitioner had been convicted of sexual assault in the first degree in violation of General Statutes § 53a-70.

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

1984. In 1996, the [petitioner], who was thirty-five years old, was the boyfriend of the victim's aunt. The [petitioner] and the victim's aunt lived together in a house near a lake, where MC sometimes visited. Usually, the [petitioner] went to MC's house to pick her up and bring her to her aunt's house. During the visits, MC and the [petitioner] often played video games or went fishing together.

"Three acts of sexual contact by the [petitioner] occurred during the period from June, 1996, through September, 1996, when MC was twelve years old. In the first incident, the [petitioner] kissed MC's breasts and vaginal area. In the second incident, which occurred in August, 1996, when the [petitioner] and MC were fishing from a boat on the lake, the [petitioner] placed MC's hand on his penis. He then put his hand over hers and manually stimulated himself until he ejaculated. During the third incident, which occurred in September, 1996, the [petitioner] invited MC to come to his bed. He then got on top of her, pinned her hands above her head, and penetrated her vagina with his penis. MC did not tell her mother or aunt about the events with the [petitioner] because she was afraid of the [petitioner]. In October, 1996, MC and her family moved to another state.

"In February, 1998, while cleaning MC's bedroom, her mother found a letter written to MC from a man named W,[3] who was a friend of MC's family. W had begun to baby-sit for MC and her siblings in the summer of 1997. At that time, W was thirty-two years old and MC was thirteen. In the letter, W told MC that he wanted to hold her and take her pain away.

"MC's mother was concerned about the contents of the letter and confronted W about his relationship with

---

[3] In *State* v. *Toccaline*, supra, 258 Conn. 546, our Supreme Court referred to that man only as W and, as such, we will continue the practice in this opinion.

MC. Her mother also confronted MC about her relationship with W. Although she denied any sexual contact with W, MC told her mother about the incidents that had occurred with the [petitioner] during the summer of 1996. MC also had told W about the [petitioner's] conduct prior to disclosing this information to her mother.

"The [petitioner] gave a statement to the police in which he responded to MC's allegations of sexual abuse. In the statement, the [petitioner] claimed that he and MC often 'horse played' together. The [petitioner] admitted that he may have had sexual contact with MC during this horseplay, although, he claimed, MC never objected to such contact and that the contact did not constitute intercourse. The statement was entered into evidence and read aloud to the jury." Id., 545–47.

Following his unsuccessful appeal, the petitioner brought his petition for a writ of habeas corpus. By memorandum of decision filed September 12, 2002, the court granted the petition, finding that both trial and appellate counsel had been ineffective, and that their ineffectiveness entitled the petitioner to a new trial. This appeal followed.

As a prelude to our discussion of the issues on appeal, we set forth our standard of review as well as an overview of relevant habeas corpus law. "Our standard of review in a habeas corpus proceeding challenging the effective assistance of trial counsel is well settled. Although a habeas court's findings of fact are reviewed under the clearly erroneous standard of review . . . [w]hether the representation a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Citation omitted; internal quotation marks omitted.) *Alvarez* v. *Commissioner of Cor-*

*rection,* 79 Conn. App. 847, 848, 832 A.2d 102, cert. denied, 266 Conn. 933, 837 A.2d 804 (2003).

The petitioner's right to the effective assistance of counsel is assured by the sixth and fourteenth amendments to the federal constitution, and by article first, § 8, of the constitution of Connecticut. "In *Strickland* v. *Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (Citations omitted; internal quotation marks omitted.) *Minnifield* v. *Commissioner of Correction,* 62 Conn. App. 68, 70–71, 767 A.2d 1262, cert. denied, 256 Conn. 907, 772 A.2d 596 (2001).

To prove that his counsel's performance was deficient, the petitioner must demonstrate that trial counsel's representation fell below an objective standard of reasonableness. See *Aillon* v. *Meachum,* 211 Conn. 352, 357, 559 A.2d 206 (1989). Competent representation is not to be equated with perfection. "The constitution guarantees only a fair trial and a competent attorney; it does not ensure that every conceivable constitutional claim will be recognized and raised." (Internal quotation marks omitted.) *Jeffrey* v. *Commissioner of Correction,* 36 Conn. App. 216, 219, 650 A.2d 602 (1994). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Goodrum* v. *Commissioner of Correction*, 63 Conn. App. 297, 300–301, 776 A.2d 461, cert. denied, 258 Conn. 902, 782 A.2d 136 (2001).

With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland* v. *Washington*, supra, 466 U.S. 687. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (Citations omitted; internal quotation marks omitted.) *Fair* v. *Warden*, 211 Conn. 398, 408, 559 A.2d 1094, cert. denied, 493 U.S. 981, 110 S. Ct. 512, 107 L. Ed. 2d 514 (1989).

With those principles in mind, we now turn to the respondent's claims. Additional facts will be set forth as appropriate.

## I

The respondent's first claim is that in gauging the effectiveness of the petitioner's trial counsel in the underlying criminal trial, the habeas court improperly applied the standard for determining effectiveness. Because the habeas court found that trial counsel had been ineffective in several ways, our review requires us to assess each finding.

## A

The respondent claims that the habeas court improperly found trial counsel ineffective by failing to object to inappropriate testimony from the state's constancy of accusation witness, Elton Grunden. We agree with the respondent.

Grunden, a licensed clinical social worker at a counseling and mental health center, testified on direct examination as part of the state's presentation that when he met with MC, in February, 1998, she described instances of sexual contact with her by the petitioner. Grunden stated his belief that MC had suffered sexual abuse by the petitioner. Finally, he opined that MC's testimony was truthful, based, in part, on the consistency of her accusations. Counsel for the petitioner did not object to any of Grunden's testimony.

At the habeas trial, Mark C. Hauslaib, the petitioner's trial counsel, was called as a witness. He testified that although at the time of the trial he was not specifically aware of the rule that an expert witness may not testify that a victim is credible, he was aware, however, that the questioning in that regard was improper. He stated that as a general rule, he does not make many objections during trial and that when that testimony was given, he thought he might be able to use Grunden's statement of opinion on cross-examination to demonstrate that

Grunden had reached his opinion rashly on the basis of just a brief interview of MC.

At the habeas hearing, attorney Leon M. Kaatz testified as an expert witness on the petitioner's behalf that it was below the standard of competence for Hauslaib not to have objected to Grunden's testimony regarding MC's veracity because it is well established in Connecticut that a constancy of accusation witness may not offer an opinion at trial as to a victim's veracity. The court agreed. Additionally, the court concluded that if Hauslaib had objected to the testimony, Grunden's credibility would have been negatively affected. The court further concluded that a diminution in Grunden's credibility would have caused reasonable doubt resulting in an acquittal.[4]

At the outset, we note that "[t]he decision of a trial lawyer not to make an objection is a matter of trial tactics, not evidence of incompetency." (Internal quotation marks omitted.) *Levine* v. *Manson*, 195 Conn. 636, 648, 490 A.2d 82 (1985). "[T]here is a strong presumption that the trial strategy employed by a criminal defendant's counsel is reasonable and is a result of the exercise of professional judgment . . . ." (Citation omitted.) *Iovieno* v. *Commissioner of Correction*, 67 Conn. App. 126, 128, 786 A.2d 1113 (2001), cert. denied, 259 Conn. 916, 792 A.2d 851 (2002). In this case, Hauslaib testified as to his belief that he may have made a tactical decision not to object in order to use the statement to discredit Grunden on cross-examination. Our review of the trial court record corroborates Hauslaib's testimony. It appears from his cross-examination of Grunden that Hauslaib was attempting to discredit Grunden's

[4] The court also implied that had Hauslaib objected, it would have altered the standard of review on appeal, which would have resulted in a reversal by our Supreme Court on direct appeal.

opinion by showing that he had met MC only one time.[5] His closing statement to the jury further supports his habeas testimony.[6] In apparent acceptance, however, of a wooden proposition that competent counsel must always object to objectionable opinion testimony by an expert, the court accorded no deference to the exercise of discretion and use of tactics by trial counsel. In determining that Hauslaib was ineffective for not objecting to Grunden's testimony merely because the testimony was, in fact, objectionable, the court ignored our jurisprudence that mandates deference to the tactics of trial counsel.

Even if Hauslaib's failure to object could not be perceived as trial tactics, the petitioner's claim neverthe-

---

[5] The following is the relevant portion of the cross-examination of Grunden by Hauslaib:

"[Defense Counsel]: Now, you saw [MC] how many times?

"[The Witness]: Once.

"[Defense Counsel]: Once. So, on the basis of your seeing the alleged victim in this case one time and then sitting in court listening to her respond to the questions of the [prosecutor] posed to her, you can say, I think it was, with no doubt that in fact this [petitioner] did these things to this woman.

"[The Witness]: I have no doubt that this [is] what the young lady believes happened, and I feel sure that they indeed did happen. I have no reason to disbelieve her.

"[Defense Counsel]: Okay. You have no reason to disbelieve her based upon what she said to you in that one meeting with her?

"[The Witness]: But also based on the fact that if there is going to be a false report, 90 percent of the time, it's in child custody cases and not in any circumstance like [what] was reported today.

"[Defense Counsel]: That's neither here nor there in this case. You're telling me that based upon your one meeting with her, which lasted, what, fifty minutes?

"[The Witness]: Full hour."

[6] The following is the relevant portion of the closing argument by Hauslaib:

"For [Grunden] to take the [witness] stand in this courtroom after seeing this victim—MC—for one hour—my recollection is he saw her for one hour on one time—may have been seen one more time by somebody else, but he saw her for an hour. He never saw the [petitioner]. For that man to take the [witness] stand in this courtroom and [testify that] he had no doubt about anything—after spending sixty minutes with an alleged victim—I think that's malpractice. . . . Sixty minutes is all this man saw her. Never saw

less fails under the second prong of *Strickland*. In hypothesizing that by objecting to the testimony, Grunden's credibility would have been eroded with the result that the jury would have entertained a reasonable doubt as to the petitioner's guilt, the court has not only engaged in speculation, but has ignored the balance of the evidence indicating the petitioner's guilt. Indeed, in refusing to afford review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), to whether the trial court improperly admitted Grunden's testimony, the Supreme Court on direct appeal stated: "We also recognize that in the present case, unlike [*State* v. *Grenier*, 257 Conn. 797, 778 A.2d 159 (2001), in which the court reversed a conviction where opinion evidence concerning the victim's veracity had been admitted over the defendant's objection], the jury was presented with significant evidence, aside from the victim's testimony, that the sexual abuse had in fact occurred. For example, MC's physician testified that a physical examination revealed that MC had experienced vaginal penetration, which most likely was caused through sexual relations. There also was testimony concerning depression and a change in character MC experienced during and after the summer of 1996. More specifically, MC's aunt testified that after the incident on the boat, MC returned to the house and appeared withdrawn and quiet, which was out of character for MC. Most importantly, the [petitioner's] own written statement corroborated much of what MC claimed to have occurred." *State* v. *Toccaline*, supra, 258 Conn. 552 n.13. We therefore conclude that in finding that the petitioner suffered prejudice, the court ignored the substantial admissible evidence of his guilt, and in that judgment the court was legally incorrect.

the [petitioner]. How is he to tell you that without a doubt, he knows that she had a relationship with the [petitioner]?"

B

The respondent next claims that the court improperly concluded that Hauslaib was ineffective for not requesting the sequestration of the witnesses. We agree with the respondent.

At the criminal trial, Hauslaib moved to sequester all the witnesses prior to the beginning of evidence with the exception of the petitioner's wife. In response, the trial court indicated that if a sequestration order were to be granted, it would include all potential witnesses, including the petitioner's wife.[7] Confronted with those alternatives, Hauslaib and the petitioner conferred and mutually decided not to pursue the sequestration motion so that the petitioner's wife could be present at the trial.

At the habeas hearing, Kaatz testified that a reasonable criminal defense attorney would have requested that the witnesses be sequestered even if that required the wife to be removed from the courtroom. The court agreed and found that if the witnesses had been sequestered, Grunden would have been unable to testify that MC's trial testimony was consistent with the statement she had made earlier to him regarding sexual abuse by the petitioner. As a consequence, the court opined, Grunden's testimony would have been weaker if all witnesses had been sequestered.

The uncontradicted testimony of Hauslaib was that the decision not to press for the sequestration of witnesses reflected the consensus he and the petitioner had reached that it was in the petitioner's best interest to have his wife present in the courtroom throughout the trial. As previously stated, it is well established that a habeas court cannot in hindsight second-guess an attorney's trial strategy. See *Iovieno* v. *Commissioner of Correction*, supra, 67 Conn. App. 128. The court should not have found for the petitioner on that ground,

[7] At the time of trial, the petitioner's wife was listed on the petitioner's list of potential witnesses.

as the evidence adduced at the habeas hearing did not overcome the strong presumption that counsel's actions represented sound trial strategy. See *Lemoine* v. *Commissioner of Correction*, 73 Conn. App. 669, 675, 808 A.2d 1194 (2002), cert. denied, 262 Conn. 932, 815 A.2d 133 (2003).

C

The respondent next claims that the court incorrectly concluded that it was ineffective for Hauslaib not to have objected to the prosecutor's closing remarks to the jury. We agree with the respondent.

In the criminal trial, the state was represented by assistant state's attorney Debra A. Collins. In her closing remarks to the jury, Collins stated that "Grunden also said that he felt that . . . something had happened with [the petitioner] and did not feel that something had happened other than the kissing with [W]." In her rebuttal argument, Collins stated: "Grunden said there was no doubt it occurred. . . . Remember, he knew he was under oath. And he said, in his opinion, it had occurred between MC and [the petitioner]." Hauslaib did not object to those comments.

The court found that it was ineffective on the part of Hauslaib to not object to the prosecutor's closing argument on the ground that the argument was improper. Additionally, the habeas court determined that if Hauslaib had objected, the trial court would have issued a curative instruction concerning the alleged improper comments by Collins or, in the alternative, a proper objection would have at least preserved the issue of prosecutorial misconduct on direct appeal. In making that determination, the habeas court incorrectly found that the statements made by Collins were improper. The court reasoned that the "citing [of] the testimony of Grunden as to the veracity of the alleged victim's statements, which [Collins] should have known was inadmissible, were egregious misstatements on her part

and should have been objected to . . . ." In reaching that conclusion, the court conflated the notions of admissible evidence with admitted evidence. In this instance, the testimony to which Collins referred in her remarks had been admitted. We are unaware of any jurisprudence that supports the court's conclusion that it was improper for the prosecutor to refer to admitted evidence that, if objected to when offered, would have been excluded. The court's finding that trial counsel was ineffective for not having objected to the use by the prosecutor of trial testimony in her closing argument was legally incorrect. Our decisional law on prosecutorial misconduct makes clear that "as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts *in evidence* and the reasonable inferences to be drawn therefrom." (Emphasis added; internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 246, 833 A.2d 363 (2003). Accordingly, Collins' statements did not constitute misconduct. Reciprocally, Hauslaib was not deficient in not objecting to them.

## D

The respondent next argues that the court incorrectly concluded that Hauslaib was ineffective for not pressing for an Elkton, Maryland, police report in pretrial discovery. We agree with the respondent.

The following additional facts are relevant to our discussion of the respondent's claim. Subsequent to the events leading to the criminal trial, MC and her family relocated to Elkton, Maryland. As previously stated, in February, 1998, MC's mother found a letter written to MC from a man named W, who was a friend of MC's family, that was suggestive of an improper relationship between MC and W. When her mother confronted her with the letter from W, MC denied that she had had any sexual contact with W, but she then told her mother

about the incidents that had occurred with the petitioner in the summer of 1995 and that ultimately gave rise to the underlying criminal charges. After that conversation between mother and daughter, MC's mother took her to see Grunden. Subsequently, a referral was made to a social service agency concerning the behavior between MC and W. In conjunction with that referral, both the social service agency and the Elkton, Maryland, police department interviewed MC, and the police department consulted with the Maryland prosecuting authority in regard to potential charges against W stemming from MC's statement.

At some juncture, the Elkton, Maryland, police department forwarded a report to the office of the state's attorney for the judicial district of Windham. Additionally, the office of the state's attorney received a copy of a letter from the Maryland prosecuting authority to the Elkton police department indicating that no prosecution of W was anticipated.

At the habeas hearing, Hauslaib testified that prior to the start of the criminal trial, he asked the prosecutor if there was a police report about W and that in response, the prosecutor gave him a letter from a Maryland state's attorney to the Elkton, Maryland, police department declining prosecution.[8] Hauslaib testified that the Windham state's attorney's office had an open file policy and that he had no reason to doubt that he had received everything that the prosecutor had in her possession. He also testified that he reviewed the state's attorney's file prior to trial and that the police report was not in that file.

At the habeas trial, the petitioner presented a report from the Elkton, Maryland, police department that

---

[8] The letter stated in relevant part: "Please be advised that I have carefully reviewed your report in the above matter. I am recommending no criminal charges be placed in this case."

included a statement that the victim had admitted to the investigating officer that she had shared twenty "french kisses" with W, had slept in the top bunk of W's truck, had slept in a bunk head to toe with W, stated that she once had told W she loved him and that W had told MC he would wait until she was eighteen years of age. The report was turned over to the petitioner by the office of the state's attorney in connection with his habeas petition. Hauslaib testified that he did not see the police report until shortly before he was called to testify at the habeas trial.

The court concluded that Hauslaib was ineffective for not having pressed for the police report during the underlying criminal proceedings. The court reasoned that because the letter from the Maryland prosecuting authority had made reference to a report, that notation sufficiently put Hauslaib on notice of the existence of the report. Accordingly, the court concluded, Hauslaib should have filed a motion to obtain the report from the state's attorney or, in the alternative, should have sought a court order to have the report produced by the Elkton, Maryland, police department. Having determined that Hauslaib was deficient in his failure to take one of those steps, the court concluded that his ineffectiveness prejudiced the petitioner on the basis of its further finding that the contents of the report would have been helpful in the cross-examination of MC and W. As a consequence of not having the report, the court determined, the cross-examination of those witnesses by Hauslaib was incomplete with the result that the petitioner was denied a fair trial. With that factual background, we now turn to the respondent's claim.

Whether possession of the Elkton, Maryland, police report would have been helpful to defense counsel in the cross-examination of W and MC was not an appropriate criteria in assessing the prejudice prong of *Strickland*. Rather, the determinative question is "whether

there is a reasonable probability that, absent the [alleged] errors, the factfinder would have had a reasonable doubt respecting guilt." (Internal quotation marks omitted.) *Fair* v. *Warden,* supra, 211 Conn. 408. Although we understand that the report contained more details of the alleged inappropriate relationship between MC and W, our review of the record indicates that the fact of that relationship was squarely before the jury. Hauslaib cross-examined both MC and W about their relationship and, in his closing statements to the jury, argued that it was W and not the petitioner who had committed the offenses against MC. Furthermore, the court's finding of prejudice was belied by the trial testimony of Leslie Lothstein, a clinical psychologist specializing in pedophilia, that a child victim of sexual abuse is often easy prey to her next molester. Viewed from that perspective, evidence of MC's subsequent inappropriate relationship with W was not at all in conflict with the testimony regarding the offenses committed against her by the petitioner. We conclude, therefore, that the court incorrectly found that the petitioner was prejudiced by the absence of the Maryland police report.[9]

E

The respondent next claims that the court incorrectly found Hauslaib ineffective for failing to present an adequate alibi defense. We agree with the respondent.

The state charged the petitioner with having committed the offenses "on or about" June, August and September, 1996, and alleged that two of the offenses occurred at 9 Oak Drive. At the criminal trial, the petitioner presented evidence that he did not live at 9 Oak Drive during the summer of 1996. His neighbor, Alison Bin-

---

[9] Because we have concluded that there was no prejudice in that regard, we need not address whether Hauslaib's performance was deficient. See *Goodrum* v. *Commissioner of Correction,* supra, 63 Conn. App. 301.

gham, testified that the petitioner moved into 28 Armitage Court around June 28 or 29, 1996, and that he lived there alone. The petitioner also testified at his criminal trial that he moved on June 28, 1996, and documents entered into evidence, authenticated that move.

At the habeas trial, the petitioner introduced additional evidence to support his claim that by the summer of 1996 he had moved from his previous address and presented testimony from others providing him with alibis for certain dates during the summer of 1996. The petitioner first introduced MC's statement to the police and the arrest warrant, each of which stated that the events of sexual contact and sexual assault had occurred on June 29, August 3 and September 7, 1996. The petitioner then presented the testimony of witnesses to corroborate that he had moved from 9 Oak Drive on June 28, 1996, and presented a specific alibi for September 7, 1996.[10] The petitioner also introduced evidence to show that the victim's aunt had moved from 9 Oak Drive on June 28, 1996, to demonstrate that the alleged events could not have taken place at 9 Oak Drive after June 28, 1996, as both the petitioner and the victim's aunt had moved from the residence as of that date.[11]

Our review of the inculpatory statement given to the police by the petitioner and introduced by the state in its case-in-chief leads us to conclude that even if the petitioner had been able to present additional alibi testimony, he would not have been able to refute the "totality of the evidence before the . . . jury." *Strickland* v. *Washington*, supra, 466 U.S. 695. The petitioner's own statement renders meaningless his latent alibi defense.

---

[10] The petitioner presented evidence that he was at a wedding on September 7, 1996.

[11] We note that only two of the incidents took place at 9 Oak Drive and that the petitioner did not present an alibi for the incident that occurred on his fishing boat.

In his statement, the petitioner admitted to three instances of sexual contact while attempting to explain that they were accidental or misunderstandings.[12] It is unreasonable to conclude that presented with the petitioner's inculpatory statement as well as the state's evidence in chief, the outcome of the trial could have been different had the petitioner been able to present further evidence concerning his whereabouts on certain dates not contained within the state's charging document or part of its case-in-chief. As a consequence, we conclude that the court was legally incorrect in its determination that the petitioner was prejudiced by his counsel's failure to present additional alibi evidence.

F

The respondent next argues that the court incorrectly granted the habeas petition on the ground that Hauslaib

---

[12] The petitioner's statement reads in relevant part: "On one occasion when [MC] was over she and I had been horsing around. . . . I recall that [MC] usually had worn either a halter top and shorts, a bathing suit or usually some other summer attire. During our 'horsing around' I recall that I moved her T-shirt up exposing her midsection, put my mouth on her skin and blew onto her skin causing a fart like noise. . . . I may have put my mouth on her in the area of her breasts and if I hit any part of her breast it was by accident. [MC] had just begun to develop her breast[s] and my mouth never touched her nipples. . . . During the time when [MC] and I were horsing around [on the boat] I may have had an erection and [MC] may have grabbed my erection by accident. When she may have grabbed my erection she didn't make a big deal about it. I never asked [MC] to grab my erection. After [MC] grabbed my erection, she didn't make a big deal about it and I never mentioned this incident to anyone. . . . On one occasion, I recall being on my bed in the bedroom. . . . During our 'horsing around' I ended up on top of her on the bed. Sometime during our horsing around she would sometime[s] get the advantage and end up on top of me. When I ended up on top of her I recall having her arms pinned up above her head holding her down. I was on top of her for just a couple of minutes and as I was on top of her she was moving around trying to get away. . . . While she was trying to get away her clothes were moving around. During the time I was on top of her when we were horsing around, it's possible that I became excited and got an erection. Being in the position that I was in on top of her she would have felt my erection in the area of her vagina. Due to the fact that we were both moving around she may have misunderstood that for sexual contact."

was ineffective for not having the petitioner testify at the suppression hearing concerning the petitioner's statement to the police.[13] We agree with the respondent.

Before the criminal trial, Hauslaib filed a motion to suppress the petitioner's signed statement to the police. On September 15, 1999, the court conducted a hearing on the motion at which two state police troopers stated that they had interrogated the petitioner and taken a statement from him. The petitioner did not testify at the suppression hearing. The court denied the motion to suppress, and the statement was read to the jury at the criminal trial.

At the habeas trial, the petitioner testified that the statement had been coerced and that it did not accurately reflect what he had told the troopers. Hauslaib testified that before the suppression hearing, he advised the petitioner not to testify, as he did not believe he would be a good witness. The court determined that Hauslaib had been deficient in his advice to the petitioner and that if the petitioner had testified at the suppression hearing, his experience as a witness may have enhanced his ability to testify convincingly later before the jury in the criminal trial that his statement had been coerced and that he was innocent of the charges. Thus, the court determined, because the petitioner had nothing to lose by testifying at the suppression hearing, it was deficient for Hauslaib not to have taken that opportunity to give the petitioner that "dry run" experience.[14] Also, the court concluded, by failing

[13] The respondent also alleged that this issue was not properly before the court, as it was not raised in the habeas petition. Although we agree that the issue was not raised in the petition for a writ of habeas corpus, we note that when evidence was presented on that issue, the respondent did not object and, in fact, cross-examined the petitioner's witness on that issue. We therefore conclude that any claim of lack of notice was waived. For a more thorough discussion of the law, see part II.

[14] In reaching that conclusion, the court apparently did not contemplate that if the petitioner had testified at the suppression hearing and again at trial, he would have been subject to cross-examination on the basis of his testimony in the suppression hearing.

to have the petitioner testify at the suppression hearing, Hauslaib denied himself the opportunity to assess the likelihood that the petitioner could successfully testify at the trial. On that basis, the court concluded that the petitioner had been prejudiced by Hauslaib's failure to call him as a witness at the suppression hearing.

The court's conclusion that had the petitioner testified at the suppression hearing, his experience would have enhanced his ability to testify successfully at trial was based not only entirely on conjecture, but was not germane to the considerations mandated by *Strickland*. To succeed on that claim, it was incumbent on the petitioner at the habeas hearing to demonstrate a reasonable probability that if he had testified, the outcome of the suppression hearing would have been different. Cf. *Minnifield* v. *Commissioner of Correction*, supra, 62 Conn. App. 75. There was no such evidence presented at the habeas trial.[15] Indeed, the court reached the opposite conclusion, finding that "it was highly likely that the trial court would deny the motion to suppress . . . ." A fair reading of the memorandum of decision suggests, however, that the court's determination in that regard was based, not on a likely different outcome in the suppression hearing, but rather on the impact the experience of testifying at the suppression hearing may have had on the petitioner's ability to testify at the trial and the impact such trial testimony may have had on the trial's outcome. It appears that the court's reasoning was as follows: Had the petitioner testified at the suppression hearing and had counsel, on the basis of that testimony, encouraged the petitioner to testify at trial, and had he then testified, the outcome of the trial probably would have been different. That analysis merely cobbles conjecture from speculation.

---

[15] The only evidence presented was the testimony of Kaatz, who testified that a reasonable attorney would have had the petitioner testify to see how he would perform under cross-examination.

The court was incorrect to grant the petition on that ground.

G

The respondent next argues that the court incorrectly found Hauslaib ineffective for not having the petitioner testify at the criminal trial that he was innocent of the charges. We agree with the respondent.

At the criminal trial, the petitioner testified for the limited purpose of establishing that he did not live at 9 Oak Drive after June 29, 1996. In his habeas petition, the petitioner alleged that Hauslaib should have had him testify that he was innocent. At the habeas hearing, Hauslaib testified that before the criminal trial, he and the petitioner had discussed whether the petitioner would testify as to his claim of innocence and that they had come to the mutual decision that the petitioner would not offer such testimony. Hauslaib testified that this decision was based on the fact that the petitioner already had given the police an incriminating statement with which he likely would have been cross-examined.

Agreeing with the petitioner's claim, the court reasoned that juries in "this type of case" generally want to hear from a defendant that he is innocent. Apparently on the basis of the petitioner's habeas testimony, the court also found that the petitioner would have made a good trial witness, could have refuted his inculpatory statement and could have explained to the jury the parts of the statement that were false. The court concluded that if one of the jurors had believed the petitioner, there would have been reasonable doubt as to whether he committed the crimes and, thereby, he probably would have been acquitted.

We have stated that "[w]hile the due process clause of the Fifth Amendment may be understood to grant the accused the right to testify, the if and when of

whether the accused will testify is primarily a matter of trial strategy to be decided between the defendant and his attorney." (Internal quotation marks omitted.) *State* v. *Robert H.*, 71 Conn. App. 289, 303, 802 A.2d 152, cert. granted on other grounds, 262 Conn. 913, 811 A.2d 1294 (2002). There is nothing in the habeas record to suggest that the decision made by Hauslaib and the petitioner concerning the scope of the petitioner's trial testimony was anything other than the result of sound trial strategy by counsel. Additionally, the court's assessment of the likelihood that the petitioner could have testified at the criminal trial convincingly on the basis of his success as a habeas witness belies the bedrock law that the effectiveness of trial counsel must be assessed on the basis of what was known or should have been known to counsel at the time of his or her decisions. Cf. *Jean-Jacques* v. *Commissioner of Correction*, 73 Conn. App. 742, 749–50, 809 A.2d 541 (2002). In short, that the petitioner may have been a convincing habeas witness bears no relevance to the reasonableness of counsel's decision to advise him against testifying at the criminal trial. Hauslaib's advice to the petitioner not to testify was not deficient. Even if the petitioner had testified at the criminal trial to proclaim his innocence, there is nothing in the record of the habeas proceeding to suggest that he would have convinced the jury that his inculpatory statement had been coerced except for the finding by the habeas court that, by the time of the habeas trial, he had become a convincing witness. The court's finding of a deficiency in Hauslaib's advice to the petitioner not to testify was legally incorrect.

## H

The respondent next claims that the court incorrectly concluded that Hauslaib was ineffective for failing to investigate. We agree with the respondent.

At the habeas trial, Todd Spoffard, the petitioner's friend and former coworker, testified that he was at 9 Oak Drive the day after the petitioner moved and that the entire residence was empty. He also testified that the petitioner and his wife attended his wedding on September 7, 1996. He further testified that in 1995, he witnessed an argument between the petitioner and the victim's aunt in which, according to Spoffard, the victim's aunt stated, "Lenny, I will fix your ass." In his testimony, the petitioner acknowledged that he had not told Hauslaib anything about Spoffard at the time of the criminal trial. Nevertheless, the court found that Hauslaib's trial performance was deficient on the basis of its reasoning that Hauslaib should have found Spoffard on his own. Having found Hauslaib deficient for not discovering Spoffard and uncovering his evidence, the court concluded that this deficiency deprived the petitioner of a fair trial.

The court reasoned as follows: "It is not sufficient for the defense attorney to rely on the memory, or lack thereof, of the [petitioner]. Hauslaib could have come across Spoffard's name by simply asking [the petitioner] in private why he thought [the victim's aunt] was doing this to him. He would probably have replied that she was a jilted girlfriend and was angry because of it, and then Hauslaib could have asked him, 'Were there any incidents in which she showed her hatred of you?' This would have probably sparked [the petitioner's] memory as to the incident at the Harte Nissan dealership to which Spoffard testified at the habeas trial, namely, that [the victim's aunt] came into the dealership, got into a real shouting match, was screaming at [the petitioner] and using profane language and concluded with, 'Lenny, I'll fix your ass.' Then, Hauslaib could have used Spoffard to impeach the credibility of [the victim's aunt]. If Hauslaib then asked [the petitioner], in private, 'Were any of these witnesses who saw you move or

saw the incident with [the victim's aunt] at the auto dealership know where you were on September 7, 1996?' This would have undoubtedly jogged the memory of both [the petitioner] and his wife, Cathy, that they had attended Spoffard's wedding on September 7, 1996."

The court's speculative reasoning did not track the test for deficiency mandated by *Strickland* and its progeny. It is well settled that "[d]efense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation and without adequate explanation, failed to call the witness at trial." (Internal quotation marks omitted.) Id., 749. The record is clear that the petitioner did not inform his trial counsel about Spoffard. Furthermore, "[t]he reasonableness of an investigation must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it." Id., 749–50.[16] Therefore, the court's finding of deficient performance was legally incorrect.

II

The respondent next claims that the court improperly considered claims not raised in the habeas petition. Specifically, the respondent claims that the petitioner did not allege in his petition that Hauslaib was ineffective for not filing a motion for a new trial on the basis of newly discovered evidence.[17] We agree with the respondent.

---

[16] As the United States Court of Appeals for the Ninth Circuit so aptly put it: "What decision [an attorney] may have made if he had more information at the time is exactly the sort of Monday-morning quarterbacking the contemporary assessment rule forbids. It is meaningless . . . for [the court] now to claim that [an attorney could] have done things differently if only he had more information. With more information, Benjamin Franklin might have invented television." *Hendricks* v. *Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995), cert. denied, 517 U.S. 1111, 116 S. Ct. 1335, 134 L. Ed. 2d 485 (1996).

[17] In his brief, the respondent argued that additional claims were not properly before the court. Although we conclude that those issues were properly before the court, our resolution of those claims on the merits in part I renders further discussion of those issues unnecessary.

"The petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action. . . . While the habeas court has considerable discretion to frame a remedy that is commensurate with the scope of the established constitutional violations . . . it does not have the discretion to look beyond the pleadings and trial evidence to decide claims not raised." (Internal quotation marks omitted.) *Cupe* v. *Commissioner of Correction*, 68 Conn. App. 262, 267–68, 791 A.2d 614, cert. denied, 260 Conn. 908, 795 A.2d 544 (2002). "The purpose of the [petition] is to put the [respondent] on notice of the claims made, to limit the issues to be decided, and to prevent surprise." (Internal quotation marks omitted.) *Jenkins* v. *Commissioner of Correction*, 52 Conn. App. 385, 406, 726 A.2d 657, cert. denied, 249 Conn. 920, 733 A.2d 233 (1999).

The second amended petition for a writ of habeas corpus set forth eleven specific grounds of ineffective assistance of trial counsel. Nowhere in that pleading did the petitioner allege that his trial counsel was ineffective for not having requested a new trial on the basis of newly discovered evidence. Accordingly, the respondent was not afforded notice of that claim and, correspondingly, the court exceeded its authority in fastening its decision to that claim. See id., 407.

### III

Last, the respondent claims that the court improperly ruled that the petitioner had established ineffective assistance of appellate counsel. We agree with the respondent.

To prevail on a claim of ineffective assistance of appellate counsel, the petitioner must establish "(1) that his appellate counsel's performance fell below the required standard of reasonable competence or competence displayed by lawyers with ordinary training and

skill in the criminal law, and (2) that this lack of competency contributed so significantly to the affirmance of his conviction as to have deprived him of a fair appeal, thus causing an unreliable conviction to stand. . . . If the issues not raised by his appellate counsel lack merit, [the petitioner] cannot sustain even the first part of this dual burden since the failure to pursue unmeritorious claims cannot be considered conduct falling below the level of reasonably competent representation." (Citations omitted, internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 51 Conn. App. 818, 820–21, 725 A.2d 971 (1999).

In its memorandum of decision, the court found appellate counsel ineffective for not having asked the Supreme Court to exercise its supervisory powers to reverse the petitioner's conviction on the ground of prosecutorial misconduct. The alleged misconduct consisted of argument made by Collins to the jury that one of the state's witnesses had vouched for MC's credibility. On the basis of its conclusion that this evidence should not have been admitted, the habeas court determined that it had been improper for Collins to refer to it in argument. In its assessment of appellate counsel's performance, the habeas court made a legally incorrect finding. The court wrongly found that the prosecutor improperly commented on evidence that would have been excluded if defense counsel had objected to it. In doing so, the court entered waters uncharted by previous appellate jurisprudence. We are unaware of any legal support for the notion that a prosecutor may not comment on evidence if, in the first place, the evidence would have been excluded if opposing counsel had objected timely to its admission. Having determined that the court incorrectly assessed the propriety of the prosecutor's closing argument, we can find no support for the court's conclusions regarding the exercise of the Supreme Court's supervisory authority.

The judgment is reversed and the case is remanded with direction to render judgment dismissing the petition for habeas corpus.

In this opinion the other judges concurred.