******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

HILBERT ROBERTS *v.* COMMISSIONER
OF CORRECTION
(AC 35122)

DiPentima, C. J., and Lavine and Harper, Js.

*Argued October 27, 2014—officially released February 10, 2015*

(Appeal from Superior Court, judicial district of
Tolland, Cobb, J.)

*Michael Zariphes*, assigned counsel, for the appellant (petitioner).

*Mitchell S. Brody*, senior assistant state's attorney,
with whom, on the brief, were *Michael Dearington*,
state's attorney, and *David Clifton*, assistant state's
attorney, for the appellee (respondent).

*Opinion*

DiPENTIMA, C. J. The petitioner, Hilbert Roberts, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court erred when it concluded that his criminal trial counsel, Paul Carty, did not render ineffective assistance when he (1) failed to investigate and present the petitioner's alibi defense at trial; and (2) failed to offer expert testimony on eyewitness identification at trial.[1] We affirm the judgment of the habeas court.

The habeas court set forth the following factual and procedural history in its memorandum of decision. "The underlying case involved a shooting [on April 17, 2005, at approximately 2:00 p.m.] in New Haven, which resulted in the death of the victim, [Elijah Stovall]. On July 31, 2006, the petitioner was convicted, after a jury trial, of (1) murder in violation of General Statutes § 53a-54a; (2) felony murder in violation of General Statutes § 53a-54c; robbery in the first degree in violation of General Statutes § 53a-134 (a) (2); criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1); and carrying a pistol revolver without a permit in violation of General Statutes § 29-35. The petitioner was sentenced by the trial court to sixty-five years imprisonment. The petitioner appealed his conviction, but the appeal was dismissed by the Appellate Court . . . ."

On August 3, 2011, the petitioner filed an amended petition for a writ of habeas corpus, claiming that Carty provided ineffective assistance of counsel. The habeas court denied the petition following a trial, concluding that the petitioner failed to prove that (1) Carty's actions were deficient when he failed to investigate and present an alibi defense; and (2) the petitioner was prejudiced by Carty's failure to call an expert in eyewitness identification issues. On September 7, 2012, the habeas court granted the petitioner's petition for certification to appeal. This appeal followed. Additional facts will be set forth as necessary.

We begin by setting forth our well settled standard of review governing ineffective assistance of counsel claims. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *McClean* v. *Commissioner of Correction*, 103 Conn. App. 254, 262, 930 A.2d 693 (2007), cert. denied, 285 Conn. 913, 943 A.2d 473 (2008).

"As enunciated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] . . . [a] claim of ineffective assistance of counsel con-

sists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A court can find against a petitioner, with respect to a claim of ineffective assistance of counsel, on either the performance prong or the prejudice prong, whichever is easier." (Citation omitted; internal quotation marks omitted.) *Ham* v. *Commissioner of Correction*, 301 Conn. 697, 703–704, 23 A.3d 682 (2011).

Additionally, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Toccaline* v. *Commissioner of Correction*, 80 Conn. App. 792, 798–99, 837 A.2d 849, cert. denied, 268 Conn. 907, 845 A.2d 413, cert. denied sub nom. *Toccaline* v. *Lantz*, 543 U.S. 854, 125 S. Ct. 301, 160 L. Ed. 2d 90 (2004).

I

ALIBI DEFENSE

The petitioner first claims that the habeas court erred when it concluded that Carty did not render ineffective assistance of counsel "when he failed to sufficiently, adequately and effectively investigate the petitioner's alibi defense and then present that alibi defense at trial." We are not persuaded.

The following testimony, presented at the habeas trial, is relevant to our resolution of this claim. Amy Doolittle testified that she had met the petitioner at a night club in April, 2005. According to Doolittle, on April 16, 2005, the day before the shooting, the petitioner visited her at her home in New Britain, and remained there until 4 p.m. of the next day. Because the petitioner did not have an automobile at that time, he was driven to and from Doolittle's house by his friend, "Keys." During cross-examination, Doolittle tes-

tified that in June, 2005, she learned that the petitioner had been arrested and was being accused of a murder that occurred on the date that the petitioner was at her house. After learning this, she made no attempt to get in touch with the police, Carty, or the prosecutor's office. She explained that she did not know how to go about coming forward with the alibi information. Doolittle did, however, admit to having some experience with the criminal justice system, having been convicted of a felony in December, 2005, and, prior to that, having been involved in four separate larcenies.

Similarly, the petitioner testified that on the morning of April 16, 2005, he was picked up by his friend, Marquis Hailey, from the house of LaPraya Little—another female he was dating at the time—and driven to Doolittle's house, where he remained until approximately 3 p.m. of the next day, April 17. The petitioner further testified that during the pretrial investigation he informed Carty of the specifics of his alibi defense. The petitioner admitted, however, that, at that time, he did not know Doolittle's last name and, therefore, had not provided it to Carty. According to the petitioner, he told Carty that on the dates in question he was with Amy from Meriden.[2]

Carty testified that, during the pretrial investigation, the petitioner told him that "on the date of the shooting he had been to the home of a female friend, a last name of Little . . . ." According to Carty, the investigation of the petitioner's claim "didn't really pan out" because, when questioned by Carty's investigator, Little stated that, on the morning of April 17, 2005, she saw the petitioner at ten or eleven o'clock "for about an hour," after which he left in the company of two men. Carty explained that he decided not to present Little as an alibi witness because she had last seen the petitioner approximately two hours before the shooting, and because she described the petitioner as wearing a white "wife beater shirt"—which matched a description given by an eyewitness to the shooting. Carty testified further that he had no recollection of the petitioner's telling him about Doolittle, and that his case notes did not contain such a name.

In its memorandum of decision, the habeas court found the testimony of the petitioner and that of Doolittle not to be credible, stating that "the petitioner did not inform Attorney Carty that Ms. Doolittle could provide an alibi defense. The court believes that had the petitioner actually been with Ms. Doolittle on Saturday [April 16, 2005] and most of the day on Sunday [April 17, 2005], the day of the shooting, he would have informed his attorney of this crucial fact. Similarly, Doolittle's testimony is undermined by the fact that she did not inform anyone that she had been with the petitioner at the time of the shooting." The court also determined that the petitioner "has failed to prove that

the testimony of Little would have been 'helpful' to the petitioner's defense at trial, as she did not provide an alibi for the time of the shooting and her testimony [had she testified at the criminal trial] could have undermined the petitioner's defense." On the basis of these determinations, the habeas court concluded "that the petitioner has failed to establish the first prong of the *Strickland* test . . . ."

Having reviewed the testimony presented at the habeas trial, we agree with the court that the petitioner has failed to establish that Carty's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. See *Strickland* v. *Washington*, supra, 466 U.S. 687. "As an appellate court, we do not reevaluate the credibility of testimony, nor will we do so in this case. The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous . . . . This court does not retry the case or reevaluate the credibility of witnesses. Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *Corbett* v. *Commissioner of Correction*, 133 Conn. App. 310, 316–17, 34 A.3d 1046 (2012).

Accordingly, we will not disturb the court's conclusion that the petitioner has failed to demonstrate that Carty's performance was deficient.

## II

### EYEWITNESS IDENTIFICATION

The petitioner next claims that the habeas court erred when it failed to determine that Carty "was ineffective after he failed to sufficiently, adequately and effectively challenge the state's eyewitness identifications at trial by failing to consult with and then present at trial, an expert witness on eyewitness identification issues." We are not persuaded.

The following background, as found by the habeas court, is necessary to facilitate our discussion. At the petitioner's criminal trial, "the defense did not deny that the petitioner was present at the scene of the shooting because a number of the eyewitnesses who knew the [petitioner] could testify that [he] was present and was the driver of the vehicle. Carty's defense strategy was to attempt to convince the jury that although the petitioner was physically present, he was not the shooter. Carty pursued this strategy through cross-examination of the state's witnesses by pointing out the inconsistencies in their identifications of the shooter."

At the habeas trial, Carty testified that he decided not

to challenge the eyewitness identification procedure employed by the police because, out of the four witnesses who did testify for the state, two—Taneisha Swindell and Jarid Buice—personally knew the petitioner from prior encounters; one—James Porter—did not identify anyone specifically; and only one—James Duarte—did not know the petitioner personally, but was able to identify him from the photographic array and later in court.

To support his claim of ineffective assistance of counsel, the petitioner presented the testimony of Jennifer Dysart, an expert on the reliability of eyewitness identifications. As the habeas court found, however, "Dysart provided limited helpful testimony about the specific identification in this case, but rather provided mostly generalized instruction on the manner in which photographic arrays should be conducted and the reliability of eyewitness identifications. Such concerns are not as pronounced, she stated, in a case like this where witnesses actually know the [petitioner] personally. As to this case specifically, all she could say was that the various witnesses testified differently concerning the shooter's clothes, height and weight."

Having heard the testimony in the case, the court found that "the petitioner has failed to prove that expert testimony regarding the [eyewitnesses'] testimony would have been helpful to the petitioner in this case. . . . Certain of the eyewitnesses who testified or could have testified, actually knew the [petitioner] personally, and, therefore, the general concepts proffered by the expert witness would not, admittedly, be particularly helpful. As to issues concerning inconsistencies in witnesses' testimonies concerning the petitioner's clothes, height and weight, and who was driving the [Acura], Attorney Carty highlighted those issues to the jury during his cross-examinations of the witnesses and the closing argument. The court presumes that Carty's decision to cross-examine witnesses, rather than call an expert . . . was a sound tactical decision. . . . The petitioner has not rebutted that presumption.

"Moreover, at the time of the petitioner's trial in July, 2006, it was the law in this state that the reliability of eyewitness identifications was generally within the knowledge of jurors and expert testimony would not generally assist jurors in determining the issue of identification. . . . Although the law on the issue of the reliability of eyewitness identification is in flux and evolving in this state . . . in 2006, when this case was tried, such testimony would not likely have been allowed by the trial court. . . .

"The petitioner has not proved that had Attorney Carty . . . attempted to call an expert witness at trial, the court would have admitted such testimony, under the law as it stood at the time of trial, or that such testimony would have altered the result of the trial.

. . . He has, therefore, not established prejudice." (Citations omitted.)

On appeal, the petitioner argues that Carty "rendered deficient performance when he failed to consult with and then present expert testimony as to identification issues and/or the fallibility of eyewitness identifications at his criminal trial," and that, if presented, such testimony "would have directly enlightened the jury as to these more complicated issues, research and information regarding the fallibility of eyewitness identifications that were well beyond the ken of the average juror." Additionally, the petitioner argues that he suffered prejudice because "absent Carty's errors, there is a reasonable probability that the outcome of the petitioner's criminal jury trial would have been different." We are not persuaded.

We begin by noting that, even though at the time of the petitioner's criminal trial Connecticut did not have a "per se bar to the admission of expert testimony on the reliability of eyewitness identifications . . . [at that time] courts consistently [had] barred the use of such expert testimony . . . reasoning [that] . . . the substance of that testimony is known to the average juror, the testimony would encroach unduly on the jury's responsibility to determine what weight to give the eyewitness testimony, and other means, including cross-examination and closing argument of counsel, are sufficient to apprise jurors of any potential weakness in the particular eyewitness identification at issue." *State* v. *Outing*, 298 Conn. 34, 98–99, 3 A.3d 1 (2010) (*Palmer, J.*, concurring), cert. denied,     U.S.    , 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011); see also *State* v. *Guilbert*, 306 Conn. 218, 232–33, 49 A.3d 705 (2012) (discussing history and reasoning behind routine exclusion of eyewitness identification expert's testimony by Connecticut courts).

Furthermore, Dysart testified that even though, at the time of the criminal trial, the debate over the reliability of different eyewitness identification procedures merited "very little debate" within the scientific community, it was still "being debated in practice." It is well settled that "while the failure to advance an established legal theory may result in ineffective assistance of counsel under *Strickland*, the failure to advance a novel theory never will." (Internal quotation marks omitted.) *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 461, 880 A.2d 160 (2005), quoting *Haight* v. *Commonwealth*, 41 S.W.3d 436, 448 (Ky.), cert. denied, 534 U.S. 998, 122 S. Ct. 471, 151 L. Ed.2d 386 (2001), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006).

Having reviewed the record in this case, we agree with the habeas court that the petitioner failed to prove that expert witness testimony would have been admitted by the trial court given the state of the law at that

time. See *Ledbetter* v. *Commissioner of Correction*, supra, 275 Conn. 462 (counsel performs effectively when maneuvering within existing law). Therefore the habeas court properly concluded that the petitioner failed to establish prejudice. Accordingly, the habeas court did not err in denying the petition for a writ of habeas corpus.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In his appellate brief, the respondent, the Commissioner of Correction, suggests that this court should not review any claims raised by the petitioner on appeal that he did not raise in his application for waiver of fees, costs and expenses and appointment of counsel on appeal that was filed along with the petition for certification to appeal. To support his claim, the respondent relies on this court's holding in *Stenner* v. *Commissioner of Correction*, 144 Conn. App. 371, 374–75, 71 A.3d 693, cert. denied, 310 Conn. 918, 76 A.3d 633 (2013), where this court declined to review the petitioner's claims because he had failed to raise them in his petition for certification to appeal or in his fee waiver application. We conclude, however, that the respondent's reliance on *Stenner* is misplaced. In *Stenner*, the habeas court denied the petitioner's petition for certification to appeal. Thus, to obtain appellate review, the petitioner had to demonstrate that the denial of certification to appeal constituted an abuse of the habeas court's discretion. On appeal, this court determined that "a petitioner cannot demonstrate that a habeas court abused its discretion in denying a petition for certification to appeal on the basis of issues that were not actually raised in the petition for certification to appeal. . . . Under such circumstances, the petition for certification to appeal could not have apprised the habeas court that the petitioner was seeking certification to appeal based on such issues. . . . A review of such claims would amount to an ambuscade of the [habeas] judge." (Internal quotation marks omitted.) Id., 374–75. In the present case, however, the habeas court granted the petition for certification to appeal. As we have held before, in such "cases, once the habeas court, in its gatekeeping function, certified that appellate review was warranted, any issue could be presented on appeal, so long as the opposing party is not prejudiced." *Logan* v. *Commissioner of Correction*, 125 Conn. App. 744, 753 n.7, 9 A.3d 776, (2010), cert. denied, 300 Conn. 918, 14 A.3d 333 (2011). The respondent has not claimed prejudice; therefore we will review the petitioner's claims.

[2] In his brief, the petitioner argues that Carty failed to investigate Doolittle as an alibi witness because he "was getting LaPraya Little confused with Amy Doolittle due to the similarity of the last names . . . ." We find no merit to this claim in the record because the petitioner testified that, at the time of the pretrial investigation, he did not know Doolittle's last name.