******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JASON BREE *v.* COMMISSIONER OF CORRECTION
(AC 40933)

DiPentima, C. J., and Sheldon and Moll, Js.

*Syllabus*

The petitioner, who had been convicted of several crimes in connection
with armed robberies at three convenience stores, sought a writ of
habeas corpus. He claimed, inter alia, that his trial counsel provided
ineffective assistance by failing to present testimony from an audio-video
forensics expert to challenge the reliability of closed-circuit television
surveillance video that was used to identify the petitioner in one of
the robberies. The petitioner challenged his convictions in two of the
robberies. In one of the robberies, the petitioner's accomplice, S, had
given the police a statement that implicated the petitioner, but S did
not identify the petitioner's photograph in an array of photographs that
he had been shown by the police. At trial, S gave a nonresponsive
reply to a question by the prosecutor and testified that the petitioner's
photograph was the number two photograph in the array but that he
never picked it out because he did not want to. The petitioner's counsel
did not object to or move to strike S's response until the state later
presented testimony from a police detective that the petitioner's photo-
graph was the second photograph in the array. The other robbery was
captured on videotape by the store's surveillance camera. The police
showed the videotape to the petitioner's probation officer, K. At trial,
when K testified that the petitioner was the individual on the videotape,
the court struck her testimony as inadmissible because it was an opinion
on the ultimate issue in the trial. The habeas court rendered judgment
denying the habeas petition, from which the petitioner, on the granting of
certification, appealed to this court. *Held* that the habeas court properly
denied the petition for a writ of habeas corpus, the petitioner having
failed to show that his trial counsel rendered ineffective assistance or
that he was prejudiced by any of counsel's decisions at trial: trial coun-
sel's reasonable strategic decision not to call an audio-video forensics
expert to testify did not fall below an objective standard of reasonable-
ness, as no witness prior to trial had identified or was expected to
identify the petitioner in the videotape, counsel made a strategic decision
to try to minimize the prominence of K's stricken testimony by not
calling an expert to undermine it, and there was no evidence in the
record that identified the petitioner in the video; moreover, trial counsel
had a reasonable basis for not objecting to S's nonresponsive testimony
in which S identified the petitioner, as counsel wanted the jury to hear
the part of S's answer in which S stated that he did not identify the
petitioner in the photographic array, but did not want to draw the jury's
attention to the unhelpful portion of S's testimony, the testimony was
not harmful until the detective was asked to bolster S's testimony that
the petitioner's photograph was the second photograph in the array,
S's credibility was thoroughly attacked, and additional evidence was
presented that identified the petitioner as the perpetrator of the robbery;
furthermore, the petitioner could not demonstrate that there was a
reasonable probability that the outcome of the trial would have been
different had his counsel presented testimony from the petitioner's step-
father, which would have been cumulative of prior testimony by the
petitioner's mother.

Argued January 22—officially released April 23, 2019

*Procedural History*

Amended petition for a writ of habeas corpus,
brought to the Superior Court in the judicial district of
Tolland and tried to the court, *Cobb, J.*; judgment deny-
ing the petition, from which the petitioner, on the grant-
ing of certification, appealed to this court. *Affirmed.*

*Freesia Singngam Waldron*, assigned counsel, for the appellant (petitioner).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Margaret E. Kelley*, state's attorney, and *Angela R. Macchiarulo*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

SHELDON, J. The petitioner, Jason Bree, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus, in which he claimed that trial counsel in his underlying criminal prosecution had rendered ineffective assistance in defending him against charges filed in connection with armed robberies of convenience stores in three Connecticut towns. On appeal, the petitioner claims that the habeas court erred in ruling that his trial counsel did not render ineffective assistance by failing (1) to consult with and to present testimony from an expert in audio-video forensics to challenge the reliability of closed-circuit television surveillance video evidence used by the state to identify him as the perpetrator in one of the robberies; (2) to timely object to and move to strike the nonresponsive testimony of the petitioner's alleged accomplice, Gabriel Santiago, identifying the petitioner's photograph in a photographic array as that of a perpetrator of another of the underlying robberies; and (3) to present the testimony of the petitioner's stepfather, Ronald Riebling, to bolster exculpatory testimony from his wife, Sue Riebling, the petitioner's mother. We disagree with the petitioner's claims and, therefore, affirm the judgment of the habeas court.

The following facts and procedural history are relevant to this appeal. In his underlying criminal prosecution, the petitioner was accused in separate informations of crimes arising from armed robberies at convenience stores in Shelton, Woodbridge and Ansonia. Two of these robberies are at issue in this appeal. The first robbery here at issue took place, as described by this court in affirming the petitioner's convictions on direct appeal, as follows: "On September 27, 2008, at approximately 6:30 a.m., Nalinjumar Patel was working at the Wooster Street Market, a convenience store in Shelton, when Gabriel Santiago entered the store, asked for loose cigarettes and inquired in what town the store was located. When Patel told Santiago that he was in Shelton and informed him that the store did not sell loose cigarettes, Santiago left. Soon thereafter, the [petitioner] and William Torres entered the store. The [petitioner] jumped behind the counter and took approximately ninety cartons of cigarettes while Torres pointed a gun at Patel, demanding his wallet. During the course of the robbery, a regular customer, Anthony Carroll, entered the store, and exclaimed: 'What the hell is going on?' Carroll immediately left the store and telephoned the police. The [petitioner], Torres and Santiago drove away in a sky blue Infiniti." *State* v. *Bree*, 136 Conn. App. 1, 4, 43 A.3d 793, cert. denied, 305 Conn. 926, 47 A.3d 885 (2012).

Surveillance cameras inside and outside of the store captured the robbery on videotape. At the conclusion of their initial investigation, however, the Shelton police

had no leads as to the identities of the perpetrators. Detective Benjamin Trabka of the Shelton Police Department thus sent still photographs taken from the store's surveillance video to local newspapers to seek the public's help in identifying the perpetrators. On September 30, 2008, the Shelton Police Department received an anonymous tip that one of the three persons shown in the video was Santiago. Upon being located by the police, Santiago gave a statement implicating the petitioner in the Shelton robbery. When, however, Trabka presented Santiago with a photographic array that included a photograph of the petitioner, Santiago did not make an identification. Through his investigation, Trabka later learned that the petitioner owned a sky blue Infiniti automobile.

The second robbery, as this court described it on the petitioner's direct appeal, took place as follows: "[W]hile Vamsi Makdhal was working at the counter of a Lukoil convenience store in Woodbridge and his cousin, Imran Sarfani, was completing paperwork in a back office, the [petitioner] entered the store. The [petitioner] placed a knife next to Makdhal's stomach and said 'give me the cash.' The [petitioner] briefly held the knife at Makdhal's neck as well. Makdhal went over to the cash register and opened it, but was too frightened to give the [petitioner] the cash, so the [petitioner] took the cash himself. When the [petitioner] asked for cartons of cigarettes, Makdhal informed him that the cartons were kept in the back office. The [petitioner] took Makdhal to the back office. The [petitioner] took a garbage bag from the office, emptied it and told Sarfani to put cartons of cigarettes in the bag. At some point, the [petitioner] waved the knife at Sarfani. After Sarfani complied, the [petitioner] ran out of the store. Makdhal ran out of the store and was able to see the model of the car that the [petitioner] drove away in, [a Chrysler 300] and [its] partial license plate number." Id., 5–6.

The Woodbridge robbery was also captured on videotape by the store's surveillance camera, and the video was recovered by the police. As in the Shelton case, no witness to the Woodbridge robbery was able to make an identification. Detective Robert Crowther of the Woodbridge Police Department therefore requested that a dispatcher from his department run various permutations of the partial license plate number that the victim had given him in an attempt to match it to a Chrysler 300. He eventually determined that the vehicle was owned by Enterprise Rental Car, which had rented it to the petitioner at the time of the robbery. Upon receiving this information, Crowther questioned the petitioner about the robbery after informing him only that the police knew that a vehicle he had rented had been used in the robbery and that they wanted to speak to him about it. During the course of the interview, the petitioner blurted out: "I don't know anything about putting no knife to anybody's neck." Crowther noted

that he had not told the petitioner either what kind of weapon was used during the robbery or how it was used.

Subsequently, Crowther contacted the petitioner's probation officer, Tricia Kolich, and "told [her] that [the police] had [surveillance video] of a robbery, in which they thought [the petitioner] was a suspect, and because [she] had [the petitioner] on probation, they were wondering would [she] be able to identify him in a video." Kolich met with Crowther to view the video and told him that the person depicted in it "[had] a lot of similar characteristics to [the petitioner], that [she recognized] the facial hair . . . the style of dress, and the kind of strut, or the walk, coming through the store, as being the same as [the petitioner]." After further police investigation, the petitioner was arrested and charged in connection with both robberies and a third robbery that had been committed in Ansonia.

Prior to trial, the petitioner's attorney, Vito Castignoli, filed several pretrial motions, including a motion in limine to preclude Kolich from identifying the petitioner in the store surveillance video of the Woodbridge robbery. He argued that the identification was tainted by the suggestive identification procedure employed by Crowther, who had interviewed Kolich. He claimed, more specifically, that Crowther had asked Kolich to identify the petitioner personally, identifying him by name, rather than asking her more generally if she recognized anyone in the video. Castignoli further argued that Kolich's identification of the petitioner should be precluded because it constituted a lay opinion about the ultimate issue in the case, and, thus, was inadmissible under *State* v. *Finan*, 275 Conn. 60, 68–69, 881 A.2d 187 (2005) (holding that whether defendant was one of two perpetrators of robbery shown on surveillance videotape was ultimate issue of fact in defendant's trial and to admit lay opinion testimony that defendant was shown on videotape was error). At the hearing on the motion, Kolich testified that "the person [in the video] has a lot of similar characteristics to [the petitioner], that [she recognized] the facial hair on [the person], the style of dress, and the kind of strut, or the walk, coming through the store, as being the same as [the petitioner]." The court denied the motion in limine to preclude Kolich's proffered testimony, ruling that (1) the identification procedure was not unnecessarily suggestive, and (2) Kolich's testimony was only that the person in the video looked similar to the petitioner, and, thus, did not constitute a definitive identification of the petitioner of the sort that was held to be inadmissible under *Finan*.

At trial, however, Kolich went further in her testimony about the person shown on the videotape, stating that "there's a very good possibility that it is [the petitioner]," then adding that she would "bet money [that

it was the petitioner in the video], if [she] had to." Upon defense counsel's timely objection to this changed testimony, the court ruled that Kolich's identification was inadmissible under *Finan* because it was an opinion on the ultimate issue in the trial. On that basis, the court ordered that her entire testimony be stricken in relation to the Woodbridge robbery. Defense counsel then moved for a mistrial, which was denied. When the jury returned to the courtroom, the court explained to the jury that it had granted the motion to strike the probation officer's testimony in its entirety and instructed the jury that it was not to "use that [testimony], at all, in [its] deliberations." At the end of the trial, Castignoli noted during the charge conference that he had given it much thought and had decided to request that the court not caution the jury again regarding Kolich's stricken testimony in its final charge.

In its case-in-chief, the state also presented the testimony of Santiago. Santiago testified that the petitioner had robbed the convenience store in Shelton while he, Santiago, was asleep in the petitioner's car. On Castignoli's recross-examination, the following colloquy occurred:

"[Defense Counsel]: Mr. Santiago, on two separate occasions, on one occasion when you told the police that you were not in Shelton at all that night, on the other occasion when you went through the photo spread, you did not tell the police the truth. Correct?

"[The Prosecutor]: Objection. Asked and answered; outside the scope of the redirect.

"[Defense Counsel]: It was brought up on redirect.

"[The Court]: Overruled. You may answer the question. Go right ahead.

"[Santiago]: All right. I didn't—I didn't answer—I didn't— if, okay, if the police lineup, the picture, right, he's number two, if that's what you want to know. He was number two. I never picked it out because I didn't want to. It's not like—" Castignoli did not move to strike Santiago's answer to his question at that time.

Following Santiago's testimony, the state called Trabka, who testified that the petitioner's photograph was indeed the second photograph in the array that he had prepared and presented to Santiago. At that point Castignoli objected, arguing that Trabka's testimony was irrelevant, more prejudicial than probative, and hearsay. He also requested that Santiago's previous nonresponsive testimony that the petitioner's photograph was number two in the array be stricken, arguing that the state was now using Trabka's testimony to bolster Santiago's nonresponsive answer concerning the petitioner's photograph. Counsel's timely objections to Trabka's testimony and belated objection to Santiago's testimony were overruled.

In the petitioner's case-in-chief, he presented the testimony of his mother, Sue Riebling. She testified that when she spoke to detectives investigating the Woodbridge robbery the day after it occurred, they informed her that the perpetrator had held a knife to the neck of the store clerk. Later that day, she spoke to the petitioner on the telephone and relayed to him the information about the robbery that she had received from the detectives. Crowther's interview with the petitioner, in which he blurted out those very details about the robbery, occurred approximately one week after the petitioner's conversation with his mother.

After concluding its deliberations, the jury found the petitioner guilty of one count each of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (4), larceny in the second degree in violation of General Statutes § 53a-123, conspiracy to commit larceny in the second degree in violation of §§ 53a-48 (a) and 53a-123, illegal possession of a weapon in a motor vehicle in violation of General Statutes § 29-38 (a), and larceny in the sixth degree in violation of General Statutes § 53a-125b, and of three counts of robbery in the first degree in violation of § 53a-134. He was later sentenced to a total effective term of fifteen years incarceration followed by five years of special parole.[1] The petitioner subsequently appealed from his convictions, which were affirmed by this court on June 5, 2012. See *State* v. *Bree*, supra, 136 Conn. App. 24.

The petitioner commenced this habeas corpus action on April 12, 2013, challenging the effectiveness of trial counsel in the underlying criminal prosecution.[2] At the habeas trial, the petitioner presented the testimony of three witnesses: Robert Sanderson, an audio-video forensics expert; Ronald Riebling, the petitioner's stepfather; and Castignoli.

Sanderson testified that he had examined the closed-circuit television surveillance video of the Woodbridge robbery that had been shown to Kolich in order to determine if she could identify the petitioner as one of the perpetrators, and stated that it was his expert opinion that the quality of the video was so poor that it was unusable for the purpose of identifying the perpetrator by his facial features or how he moved. Ronald Riebling testified that he had had a private conversation with Crowther regarding the Woodbridge robbery on the same day as his wife, Sue Riebling, and that in that conversation Crowther had likewise identified the weapon used in the robbery and described the manner in which it was used by the robber. Ronald Riebling further testified that he, too, had been available and willing to testify at the petitioner's criminal trial about his conversation with Crowther, and that he had so informed Castignoli, but he was never asked to testify.

Castignoli testified that he did not consider calling an audio-video expert in the petitioner's trial to opine about the quality of the surveillance video of the Woodbridge robbery because no witness had identified the petitioner or was expected to identify the petitioner from the video. He also noted that, after the court had stricken the testimony of Kolich purporting to identify the petitioner in that video, he wanted to minimize the significance of her stricken testimony and not draw any additional attention to it by calling an expert witness to undermine an identification that was no longer in evidence.

Castignoli further testified about his decision not to object during the testimony of Santiago. He conceded that he could have objected to Santiago's testimony at the time his nonresponsive answer was given, but explained that he chose not to do so because he had elicited information in that same answer that he wanted to the jury to hear, to wit: that Santiago did not initially identify the petitioner in the photographic array shown to him by Trabka. Castignoli further explained that he did not find Santiago's nonresponsive answer to be damaging until Trabka was called to bolster it by confirming that the petitioner's photograph was, as Santiago had stated, the second photograph in the array. When asked whether he considered calling Ronald Riebling to testify at the petitioner's trial to confirm the testimony of his wife about the conversation with Crowther, he stated that he thought such testimony would be cumulative and unnecessary.

In its memorandum of decision, the court denied the petitioner's petition for a writ of habeas corpus, concluding that (1) it was a reasonable strategic decision for counsel not to call an audio-video expert to opine as to the quality of the surveillance video when no witness had been expected to identify the petitioner in the video, and the petitioner was not prejudiced by that decision because Kolich's entire testimony, including her identification of him in the surveillance video, had been stricken; (2) it was a reasonable strategic decision for counsel not to move to strike Santiago's testimony identifying the petitioner in the photographic array in connection with the Woodbridge robbery, and the petitioner was not prejudiced by that decision because there was substantial additional evidence linking the petitioner to that robbery, ensuring that the outcome of the trial would not have been different had the testimony been stricken; and (3) it was a reasonable strategic decision for counsel not to call Ronald Riebling as a witness in the defense's case-in-chief because his testimony would have been merely cumulative. On September 25, 2017, the court granted the petitioner's petition for certification to appeal, and this appeal followed.

We begin by setting forth our standard of review. "The

habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Horn* v. *Commissioner of Correction*, 321 Conn. 767, 775, 138 A.3d 908 (2016).

The legal principles that govern an ineffective assistance claim are well settled. See *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . The second prong is . . . satisfied if the petitioner can demonstrate that there is a reasonable probability that, but for that ineffectiveness, the outcome would have been different." (Citation omitted; internal quotation marks omitted.) *Horn* v. *Commissioner of Correction*, supra, 321 Conn. 775–76.

Regarding the performance prong, "[j]udicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 539, 138 A.3d 378, cert. denied, 321 Conn. 923, 138 A.3d 284 (2016).

With these principles in mind, we turn to the petitioner's claims of ineffective assistance. The petitioner first claims that the habeas court erred in finding that Castignoli did not render ineffective assistance by failing to consult with or to present the testimony of an audio-video forensics expert regarding the reliability of the closed-circuit television surveillance video that was used by the state for identification purposes in the Woodbridge case. We disagree.

"We are mindful that, under certain circumstances, the failure to use [an] expert can result in a determination that a criminal defendant was denied the effective assistance of counsel. . . . Nevertheless, the question of whether to call an expert witness always is a strategic decision. . . . [S]trategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Arroyo* v. *Commissioner of Correction*, 172 Conn. App. 442, 467, 160 A.3d 425, cert. denied, 326 Conn. 921, 169 A.3d 235 (2017).

We agree with the habeas court's conclusion that Castignoli made a reasonable strategic decision not to call an expert to opine on the quality of the surveillance video for identification purposes because prior to the trial no witness had identified the petitioner or was expected to identify the petitioner in the video. We also note that the petitioner's argument fails to consider that the testimony that the expert would have been called to undermine was stricken from the record. Castignoli explained that he made a strategic decision to try to minimize the prominence of Kolich's testimony once it was stricken by not requesting a second curative instruction during the final jury charge and by not calling an expert to opine on the quality of the video. We cannot conclude that the decision not to call an expert witness under these circumstances falls below an objective standard of reasonableness. Even if the petitioner met his burden with respect to the performance prong of *Strickland*, he failed to demonstrate that there is a reasonable probability that, but for counsel's alleged ineffectiveness, the outcome of his trial would have been different.

In this regard, the petitioner argues that Castignoli understood the significance of the testimony at issue because he moved to preclude it in his motion in limine, and thus his failure to present the testimony of an audio-video forensics expert left him without a key witness and a viable defense. This argument from the petitioner again fails to consider that the audio-video forensics expert would have been presented to undermine an identification that was ultimately stricken from the record. With no evidence in the record identifying the petitioner in the video, we cannot say that the outcome of the trial would have been different if an expert had been called to discuss the poor quality of that video. For the foregoing reasons, we agree with the court that Castignoli did not render ineffective assistance by failing to call an expert in audio-video forensics.

The petitioner next contends that the court erred in finding that Castignoli did not render ineffective assistance by failing to timely object to and move to strike the nonresponsive testimony of Santiago identifying the petitioner during recross-examination. We disagree. "[T]he decision of a trial lawyer not to make an objection is a matter of trial tactics, not evidence of incompetency. . . . [T]here is a strong presumption that the

trial strategy employed by a criminal defendant's counsel is reasonable and is a result of the exercise of professional judgment . . . ." (Citation omitted; internal quotation marks omitted.) *Toccaline* v. *Commissioner of Correction*, 80 Conn. App. 792, 801, 837 A.2d 849, cert. denied, 268 Conn. 907, 845 A.2d 413, cert. denied sub nom. *Toccaline* v. *Lantz*, 543 U.S. 854, 125 S. Ct. 301, 160 L. Ed. 2d 90 (2004).

At the habeas trial, Castignoli gave several cogent reasons why he chose not to object to the nonresponsive testimony of Santiago, including that he wanted the jury to hear part of that same nonresponsive answer, that he did not want to draw the jury's attention to the unhelpful portion of the testimony by objecting to it, and that he did not find the testimony to be harmful until Trabka was asked to bolster it. Because Castignoli articulated a reasonable basis for his decision not to object and, as noted by the habeas court, "[i]n light of the requirement to indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," we agree with the habeas court that "Castignoli's performance was not constitutionally deficient."

Moreover, the petitioner failed to demonstrate that he was prejudiced by counsel's failure to object to Santiago's nonresponsive testimony in light of the entirety of his testimony. On cross-examination, Castignoli attacked Santiago's credibility by inquiring in great detail about his significant criminal history, his drug use, his involvement in and pending case in connection with the robbery at issue, and his inconsistent statements to the police regarding that robbery. Additional evidence was also presented as to the identity of the petitioner as a perpetrator in the Shelton case: specifically, that the petitioner owned a sky blue Infiniti, which matched the description of the vehicle that was seen leaving the store after the robbery was committed, and that he knew details about the robbery that the detectives had not shared with him. Because Santiago's credibility was thoroughly attacked and additional evidence was presented that identified the petitioner as the perpetrator of the Shelton robbery, we agree with the court that the petitioner failed to establish that the outcome of his trial would have been different had Castignoli timely objected to Santiago's nonresponsive testimony identifying the petitioner.

Finally, the petitioner argues that the court erred in finding that Castignoli was not ineffective for failing to present the testimony of Ronald Riebling. We disagree. "The failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." *State* v. *Talton*, 197 Conn. 280, 297, 497 A.2d 35 (1985). Where the evidence at issue is merely cumula-

tive, this court has found that the petitioner cannot demonstrate that there is a reasonable probability that, but for the failure to present such evidence, the outcome of the trial would have been different. See, e.g., *Hall* v. *Commissioner of Correction,* 152 Conn. App. 601, 610, 99 A.3d 1200, cert. denied, 314 Conn. 950, 103 A.3d 979 (2014).

As conceded at trial by Ronald Riebling, his testimony would have included the same facts and circumstances that were testified to at the petitioner's trial by Sue Riebling, and he would not have provided any new or additional information to the jury. We thus agree with the habeas court's finding that such testimony would have been cumulative. Castignoli's decision not to present such testimony, therefore, did not constitute deficient performance or prejudice the petitioner.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The petitioner was sentenced in the Shelton case to fifteen years of incarceration followed by five years of special parole. In the Ansonia case, which is not at issue in this appeal, he was sentenced to a concurrent term of five years of incarceration. In the Woodbridge case, he was sentenced to a concurrent term of fifteen years of incarceration followed by five years of special parole.

[2] A trial was first held on the petitioner's claims on September 8, 2016, which ended in a mistrial due to a conflict of interest with the petitioner's first counsel's firm.